876 P.2d 1137

In the Matter of the APPEAL IN MARICOPA COUNTY, JUVENILE ACTION NO. JS–8490.

No. CV–93–0385–PR.

Supreme Court of Arizona, En Banc.

June 30, 1994.

Grant Woods, Atty. Gen. by Caroline E. Bond and Mary L. Verdier, Phoenix, for Dept. of Economic Sec.

Friedl, Richter & Buri by Charles E. Buri, Phoenix, for Natural Father.

Gary A. Wieser, Phoenix, for Minor Child.

## OPINION

FELDMAN, Chief Justice.

The issue in this case is whether the trial court erred in severing the parental rights of an unwed father. The father had no contact with his daughter until almost four years after her birth, when he responded to the petition by the Arizona Department of Eco-

nomic Security (DES) to terminate his rights based on abandonment.

The trial court found that the father had abandoned his daughter and terminated his parental rights. The father appealed, arguing that the trial court abused its discretion because there was no clear and convincing evidence that he intended to abandon his child. The court of appeals agreed and reversed the trial court's decision. *In re Appeal in Maricopa County Juvenile Action No. JS–8490,* No. 1 CA–JV 91–0061 (Ariz.Ct. App. Aug. 31, 1993) (memorandum decision). DES filed a petition for review. We granted review because the case presented novel issues together with some issues affected by our recent opinion in *In re Appeal in Pima County Juvenile Severance Action No. S–114487,* 179 Ariz. 86, 876 P.2d 1121 (Ariz.Sup. Ct.1994). We have jurisdiction under Ariz. Const. art. 6, § 5(3) and A.R.S. § 12–120.24.

## FACTS AND PROCEDURAL HISTORY

JoEmma and Ray cohabitated for six months beginning in 1985 or 1986. They shared an apartment with, among others, two brothers, Roberto and Juan. Unknown to Ray, JoEmma also was having sexual relations with Roberto. When Ray learned of this, he ordered JoEmma and Roberto to move out. At that time, JoEmma was carrying Ray's child, although Ray claims he was unaware of the pregnancy. A short time after JoEmma gave birth to a daughter in February 1987, she and Roberto moved to Florida, where JoEmma had another child, this time by Roberto. When Ray spoke to his former roommate Juan in 1987, Juan told him that JoEmma had given birth to Maria, and that Maria looked a lot like Ray.

JoEmma returned to Phoenix with her two children but was unable to adequately care for them. After numerous referrals to Child Protective Services, the children were placed in DES custody. DES began dependency proceedings [1] in June 1988, naming Ray as

Maria's father. JoEmma confirmed this but gave DES no information on Ray's whereabouts. DES could not locate Ray, and in September 1989 filed a petition to terminate Ray's parental rights on the ground of abandonment. *See* A.R.S. § 8–533(B)(1).[2] After a hearing in November 1989, the court granted the petition.

About a month before the court terminated Ray's parental rights, in October 1989, Ray fortuitously encountered JoEmma at a bus stop in downtown Phoenix, where he asked JoEmma if he was Maria's father. JoEmma admitted he was, and although she knew Maria was in foster care in Phoenix, she told Ray that Maria was in Oregon with her grandmother. She did not tell Ray that a termination petition was pending, and Ray did not ask JoEmma how he could contact her or his daughter, now two and one-half years old. That was the last time Ray saw JoEmma.

Almost a year later, Ray unexpectedly encountered Roberto at a grocery store. Roberto told Ray that JoEmma had placed both daughters for adoption in Phoenix. In September 1990, eleven months after JoEmma told Ray about his daughter, Ray discussed this situation with a cousin who was a DES foster parent. The cousin learned that Maria was in DES custody and that the foster parents with whom Maria had been placed were in the process of adopting her.

At the November 1990 adoption hearing, the court vacated the earlier termination order and reinstated the petition for termination of Ray's parental rights because the published notice of the termination hearing had erroneously listed Roberto rather than Ray as Maria's father. Ray sent a letter to the court saying that he wanted custody of Maria. The court found him indigent and appointed counsel for him. The court then reheard the termination claim by conducting a two-part hearing: first on abandonment and then on the best interest of the child. The trial court applied the abandonment defi-

---

1. *See* A.R.S. § 8–223(B)(3).

2. A.R.S. § 8–533 states in pertinent part:
   B. Evidence sufficient to justify the termination of the parent-child relationship shall

include any one of the following, and in considering any of the following grounds, the court may also consider the needs of the child:
   1. That the parent has abandoned the child.

nition from A.R.S. § 8–546[3] and again found that Ray had abandoned Maria. The court found that it would be in Maria's best interest to terminate the parental relationship so that the adoption could proceed.

Ray appealed from the termination order. The court of appeals held that to prove abandonment, DES must show "clear and convincing evidence of *intentional* conduct on the part of the parent which evinces a purpose to forego all parental duties and relinquish all parental claims...." *Maricopa County Juvenile No. JS–8490*, mem. dec. at 7 (emphasis in original). Using this definition, the court found that there was not clear and convincing evidence of intent to abandon because Ray did not have sufficient reason to believe that he had a child, and when he did discover that fact, he "expressed concern for the child." *Id.* at 12 ("The appellant's statements and actions are not consistent with ... those of a parent intending to abandon his child.") Accordingly, the court of appeals reversed the trial court's ruling, finding that the trial court abused its discretion when it found abandonment.

On review, DES argues that the court of appeals incorrectly found that the trial court abused its discretion in finding abandonment. DES also contends that the lower courts have inconsistently applied the settled purpose test[4] and asks us to decide the proper judicial standard in abandonment proceedings.

Ray presents two arguments. First, he claims that he could not have abandoned Maria because he did not know about her, and after discovering that he had a daughter, he had no way to find her. He also argues that after learning of Maria, he believed that

JoEmma's family was adequately caring for her. As soon as he discovered that Maria was a ward of the state, he tried to find her. Ray claims that his rights may not be terminated unless there is evidence that he did not intend to reserve the right to reclaim Maria. He argues, and we assume, that this record shows no such intent.

## DISCUSSION

### A. DEFINITION OF ABANDONMENT

Ray claims he exhibited no settled purpose to abandon Maria. However, as DES argues, the settled purpose test may not fit this case. In a recent case we examined the extent of an unwed father's constitutionally protected right to parent his child. We held that an unwed father with no existing parental relationship must act quickly and persistently after the child's birth to take whatever steps are reasonably possible to develop a parental relationship. *Pima County Juvenile*, at 96–97, 876 P.2d at 1131–1132 (citing *Lehr v. Robertson*, 463 U.S. 248, 103 S.Ct. 2985, 77 L.Ed.2d 614 (1983)). It is only when the father steps forward and participates in the rearing of his child that "his interest in personal contact with his child acquires substantial protection under the Due Process Clause." *Id.* at 98–99, 876 P.2d at 1133–1134. This may mean shouldering significant parental duties or taking legal action, if necessary. *Id.* at 96, 876 P.2d at 1131.

We further held that it is the unwed father's responsibility to *act*, because actions speak louder than words. *Id.* Thus, the settled purpose test, which focuses on subjective intent rather than conduct, is incompatible with *Pima County Juvenile*'s require-

---

3. A.R.S. § 8–546(A)(1) states in pertinent part: "Abandoned" means the failure of the parent to provide reasonable support and to maintain regular contact with the child, *including the providing of normal supervision....* Failure to maintain a normal parental relationship with the child without just cause for a period of six months shall constitute prima facie evidence of abandonment.
   Although the trial court's findings of fact and conclusions of law do not explicitly apply this statute, the judge found: "That [Ray] ... has abandoned [his child] and *failed to maintain a parental relationship with her for at least six*

*months"* (emphasis added). This language tracks that found in the statute rather than language commonly used by courts when applying common law definitions of abandonment.

4. The settled purpose test has been defined as:
   [C]lear and convincing evidence of intentional conduct on the part of a parent that evinces a settled purpose to forego all parental duties and relinquish all parental claims to the child. *In re Appeal in Maricopa County Juvenile Action No. JS–500274*, 167 Ariz. 1, 4, 804 P.2d 730, 733 (1990).

ment that the unwed father must act. Instead, the proper definition of abandonment is found in § 8–546.

## B. THE TRIAL COURT'S FINDINGS

The trial court applied the statutory definition of abandonment found in A.R.S. § 8–546 and held that:

> [P]rior to 1989, the father had sufficient reason to believe he had fathered a child and that, having been put on notice that he had a child, *his failure to do anything to locate her constitutes abandonment*, even though he may not have known of the child's existence to an absolute certainty.

Findings of Fact and Conclusions of Law at 2 (emphasis added).

■ Ray claims that when he forced JoEmma to move out of their apartment, he did not know she was pregnant. However, Ray's cousin testified that Ray told her he knew about the child from the start. We view the facts in a light most favorable to affirming the trial court's findings. *Federoff v. Pioneer Title & Trust*, 166 Ariz. 383, 388, 803 P.2d 104, 109 (1990). But even taking Ray's testimony at face value, he nonetheless learned sometime in 1987 that JoEmma had given birth to a child. Ray admitted that he spoke to Juan two or three times while JoEmma was still in Florida and was told that JoEmma had given birth to a daughter and that "the daughter looks a lot like you." [5]

■ Furthermore, Ray inarguably learned of Maria in October 1989, when he met JoEmma at the bus stop and she told him that the child was his. Moreover, he testified that when he spoke to her there, his first question was if the child was his. This suggests that he at least suspected before then that he was the father. Yet it was not until September 1990, when he talked to Roberto and learned that Maria was to be adopted—a full three and one-half years after her birth

and almost one year after the bus stop conversation with JoEmma—that Ray took action by having his cousin telephone DES and inform a caseworker that Ray wanted custody of Maria. This was Ray's only action, other than driving around the vicinity of the bus stop. He did not contact JoEmma's friends or family, did not ask Roberto or Juan how to find her, and never searched for his daughter.

We believe that this evidence supports the trial court's finding that even if Ray did not know with certainty that the child was his, he had enough notice of the real possibility to require further inquiry. *Lehr v. Robertson* held that an unwed father must grasp his opportunity to develop a relationship with his child. 463 U.S. 248, 262, 103 S.Ct. 2985, 2993, 77 L.Ed.2d 614 (1983). This includes investigating the possibility that the child might be his. Indeed, some states have interpreted *Lehr* to say that it is a father's burden to discover the existence of his child, even if he had no notice of pregnancy or birth. *See, e.g., In re Adoption of S.J.B.*, 294 Ark. 598, 745 S.W.2d 606 (1988) (where father was "not interested enough in the outcome of his sexual encounter," due process was not violated by statute that did not require state to notify him of child and subsequent adoption); *see also In re Steve B.D.*, 112 Idaho 22, 730 P.2d 942 (1986) ("the ... opportunity may pass ungrasped through no fault of the unwed father or perhaps due to the interference of some private third party").[6]

■ The present case does not require us to explore completely the full extent of a father's obligation to discover his offspring. We do believe, however, that if a man has reasonable grounds to know that he might have fathered a child, he must protect his parental rights by investigating the possibility and acting appropriately on the information he uncovers. No other rule will satisfy

---

**5.** The court of appeals stated that "Appellant testified that he thought Juan was joking...." *Maricopa County Juvenile*, mem. dec. at 11. Apparently, the court of appeals, unlike the trial court, did not find that these conversations with Juan notified Ray that he might have a child. We believe that this finding, which is based on inference, was one for the trial court to make.

**6.** *See also* A.R.S. § 8–106.01 (eff. July 17, 1994). This new legislation, which drastically changes Arizona's adoption and termination statutes, provides that lack of notice of the pregnancy and birth is not an acceptable reason for failing to assert parental rights. *Id.* at (F) and (G).

the need for prompt and final resolution of the child's status. *See Pima County Juvenile*, 179 Ariz. at 97, 876 P.2d at 1132.

We held in *Pima County Juvenile* that the statutory definition of abandonment, as applied to an unwed father who has not developed a relationship with his child, places the burden of action on the father. *Id.* at 96, 876 P.2d at 1131. In the present case, there is no evidence that Ray took any action to ascertain the true relationship and come forward to parent Maria until he learned of the impending adoption. This is not action, merely reaction. The law does not permit one in Ray's position to sit back and wait until receipt of formal notice of fatherhood. *See, e.g., Adoption of S.J.B.*, 745 S.W.2d 606.

Applying the statutory definition of abandonment as interpreted by *Pima County Juvenile*, we find that the trial court did not err in concluding that Ray was on notice that JoEmma's child might be his and that Ray failed to act appropriately. The trial court was in the best position to measure the credibility of witnesses, an important consideration in this case because of conflicting testimony. Even though JoEmma lied about Maria being in Oregon, to develop his rights, Ray should have made some effort to find her. Instead, he did nothing. Even if Ray never formed an intent to abandon Maria, we cannot allow a child's fate to hinge on chance meetings at bus stops and grocery stores. Thus, the trial court's ultimate conclusion that Ray's conduct amounted to abandonment was not clearly erroneous. *Federoff*, 166 Ariz. at 388, 803 P.2d at 109 ("we will sustain [the trial court's] findings unless they are clearly erroneous").

### C. BEST INTEREST OF THE CHILD

Having found that the trial court did not err in its finding of abandonment, we turn now to the child's best interest. Even if a parent's actions have satisfied one of the statutory grounds for termination, parental rights may not be severed unless the court finds it would be in the child's best interest. *In re Appeal in Maricopa County Juvenile Action No. JS-500274*, 167 Ariz. 1, 4, 804 P.2d 730, 733 (1990).

The court of appeals' decision suggests that the trial court may have improperly considered Maria's best interest in making its abandonment finding. *Maricopa County Juvenile No. JS-8490*, mem. dec. at 11. We do not agree. The trial judge knew that he needed to consider the two matters separately, as shown by his bifurcating the hearings on the two issues. He then went so far as to enter a finding of abandonment before hearing argument on the child's best interest. All testimony regarding Maria's best interest was taken at the second hearing, after the court found abandonment. Thus, the trial judge could not have improperly used the caseworker's testimony or reports from the best interest hearing to make the abandonment finding.

Furthermore, when determining severance, the termination statute permits the trial court to consider evidence of whether the needs of the child are being met. A.R.S. § 8–533(B). Thus, although the trial judge could not have considered who would give Maria a better home, on the abandonment issue he could consider who had been meeting her needs in the past. The caseworker's testimony established that the foster parents, not the natural parents, were meeting Maria's emotional and physical needs.[7] This testimony could be properly considered to prove both abandonment and the child's best interest.

[13] We believe, finally, that the record supports the trial court's finding that Maria's interest would be best served by terminating Ray's parental rights. The evidence showed the following: Maria is now seven and has lived with her foster parents for six years. Removing her from her family would probably cause her severe harm. She is apparently well cared for and loved by her foster

---

7. Ray claims that because he knew Maria's needs were being met, he did not abandon her. We rejected this argument in *Pima County Juvenile*. 179 Ariz. at 97, n. 15, 876 P.2d at 1132, n. 15. A parent's responsibility goes beyond just standing by to help only if no one else will. We interpret A.R.S. § 8–533 to mean that the court may take into account "whether the *parent whose rights are at issue* has met the needs of the child." *Id.* (Emphasis in original.)

parents. Although she might benefit from a similar relationship with her natural father, the risk of harm at this point is great. The record supports the trial court's conclusion that the child's interest would be served by terminating Ray's parental rights.

## CONCLUSION

Unfortunately, Ray did too little, too late, allowing others to nurture and bond with Maria. The trial court properly applied the statutory definition of abandonment found in A.R.S. § 8–546, and the facts support its finding. Nor did the trial court abuse its discretion in finding that it is in Maria's best interest to remain with her foster parents, who wish to adopt her.

We therefore vacate the court of appeals' decision and affirm the trial court's order terminating Ray's parental rights. We remand this case to the trial court for such further proceedings as are consistent with this opinion.

MOELLER, V.C.J., and CORCORAN and ZLAKET, JJ., concur.

MARTONE, Justice, concurring in the judgment.

I write separately to note again that this father's unwed status does not affect the statutory standard for a finding of abandonment. See my concurring opinion in *In re Pima County Juvenile Action No. S–114487,* 179 Ariz. 86, 101, 876 P.2d 1121, 1136 (1994). His marriage to the mother would not have insulated him from an adverse finding under A.R.S. § 8–546(A)(1). Marital status, in a proper case, can be relevant to the *factual* question of intent, as measured objectively and not subjectively, but the *legal* standard for abandonment under the statute is the same for all parents, wedded or otherwise.

The trial judge applied the correct legal standard, without any reference to marital status. I join the court in affirming his judgment.