993 P.2d 462

**TONI W., Appellant,**

v.

**ARIZONA DEPARTMENT OF ECONOMIC SECURITY, and Jamar W., Appellees.**

**No. 1 CA–JV 98–0141.**

Court of Appeals of Arizona, Division 1, Department A.

April 13, 1999.

Review Denied Sept. 21, 1999.

Kessler & Doyle by Michael J. Doyle, Phoenix, Attorneys for Appellant Natural Mother.

Janet A. Napolitano, Attorney General by Michelle Allen Flemming, Assistant Attorney General, Phoenix, Attorneys for Appellee ADES.

A. Douglas LaSota & Associates, P.C. by A. Douglas LaSota, Phoenix, Attorneys for Child.

Michael E. Kranitz, Phoenix, Attorney for Guardian ad Litem for Natural Mother.

## OPINION

VOSS, Judge.

¶ 1 Appellant Toni W. (the mother) appeals from the juvenile court's order terminating her parental rights to her two-year old son on the ground of abandonment, pursuant to Ariz.Rev.Stat. section (A.R.S. § ) 8–533(B)(1). In this opinion we address whether the Arizona Department of Economic Services (ADES) had a duty to offer reunification services to the mother before petitioning for severance, whether ADES made a diligent effort to locate the mother, and whether the record supports the juvenile court's finding of abandonment, in light of the mother's contention that she did not intend to abandon the child without just cause.[1]

¶ 2 Because abandonment and intent are issues of fact, we accept the juvenile court's findings unless they are clearly erroneous. *Maricopa County Juv. Action No. JS–501568*, 177 Ariz. 571, 576, 869 P.2d 1224, 1229 (App.1994). Finding no error, we affirm.

### FACTS AND PROCEDURAL HISTORY

¶ 3 The mother was admitted to the hospital in labor with the child on January 23, 1996, after having been transported there by the fire department from a homeless shelter. Mother denied at first that she was giving birth, exhibited psychotic behavior, and was uncooperative during the delivery. Afterward, she seemed mentally confused, and, when she treated the infant inappropriately, hospital workers called Child Protective Services (CPS). The following day, a CPS caseworker investigated, and served the mother with a temporary custody notice, which mother refused to sign.

¶ 4 The mother testified that, after her release from the hospital she returned to and stayed at the homeless shelter for approximately four months after the child's birth, and was then incarcerated in jail from May 1996 to November 1997 on various probation violations, including failing to keep her probation officer notified of her whereabouts. During this time, she contacted neither ADES nor the hospital to determine the status of her child's health or his whereabouts. She alleged that, during a period of time after his birth, she was unaware of the existence of the child, due to her mental problems. Sometime in 1997, she became aware that ADES had custody of her child, but still did not contact them.

¶ 5 ADES made many efforts to locate the mother and ultimately found her in jail. In November 1997, ADES served her with notice of the petition to terminate her parental rights. Only then did the mother contact ADES and request visitation with the child, which was denied. ADES offered no services to mother, at that point, to attempt to reunify the family.

¶ 6 After a contested severance hearing, the juvenile court made the following relevant statements and findings:

> Given the Mother's propensity for failing to keep her APO advised of her current residential address for extended periods of time and her absconder status, it is difficult to accept her argument that somehow DES failed to provide her with services, which would have ensured return to parent but for the agency's failure to locate her . . . .
>
> . . .
>
> Mother, for her part, testified she cried for about a day after her baby was taken and went back to the homeless shelter. She states she was mentally ill, didn't know the town and later went to jail, where her competency was the central issue. This is all that is available to shed any light on the question of her intent during the six-month period related to the abandonment grounds.
>
> THE COURT FINDS that DES/CPS exercised due diligence in attempting to locate the Mother, given the circumstances of being homeless and probationary status.
>
> THE COURT FURTHER FINDS, by clear and convincing evidence, that the

---

1. By separate memorandum decision filed this date, we have addressed the remaining issues raised by mother's appeal. *See generally Fenn v. Fenn*, 174 Ariz. 84, 847 P.2d 129 (App.1993) (adopting the practice of partial publication).

Mother failed to maintain a normal parental relationship with the child without just cause for a period in excess of six months and given her circumstances did not make any efforts to support and communicate with the child as a result thereof, she did, in fact, abandon her child.

THE COURT FURTHER finds it is in the best interest for this child to be freed for adoption. The child has thrived in his foster-adopt placement. His foster parents are described as being very bonded to the child. They adequately provide for his physical, medical and emotional needs. He is well taken care of in a warm and nurturing home environment.

Based on these finding, the court terminated the mother's parental relationship to the child, and the mother appealed from that order.

## DISCUSSION

### 1. Duty of ADES to Provide Reunification Services

¶ 7 The mother argues that ADES had a duty to make a "concerted effort" to unify the family before terminating her parental rights pursuant to federal law and A.R.S. § 8–533(B). She also contends the juvenile court abused its discretion in finding that ADES made a diligent effort to locate her.

■ ¶ 8 The federal law to which mother refers requires that, to be eligible for federal grants for child welfare services, ADES must have a plan for foster care and adoption assistance that, among other things, provides that reasonable efforts will be made to both prevent or eliminate the need to remove a child from the home, and to make it possible for the child to safely return to the home. 42 U.S.C. § 671(a)(15)(B). These reunification efforts, however, are not required in all situations. For example,

[R]easonable efforts of the type described in subparagraph (B) shall not be required to be made with respect to a parent of a child if a court of competent jurisdiction has determined that—

(1) the parent has subjected the child to aggravated circumstances (as defined by

State law, which definition may include but need not be limited to abandonment....)

42 U.S.C. § 671(a)(15)(D). Thus, the federal law has recognized the futility of requiring that "reunification services" be provided in an abandonment situation.

■ ¶ 9 Regarding state law, we note that, at the time of the severance, A.R.S. § 8–533(B) provided that the juvenile court must consider, in all termination cases, "the availability of reunification services to the parent and the participation of the parent in these services." Ariz. Sess. Laws 1997, ch. 222, § 49. However, in 1998, the legislature removed this wording from subsection (B) and amended subsection (C) to require such a consideration only in termination cases based on out-of-home placement, pursuant to A.R.S. § 8–533(B)(7) and (B)(10). Ariz. Sess. Laws 1998, ch. 276, § 12. Although the 1998 amendment was not effective at the time of mother's severance, the legislative history indicates it was enacted to bring the severance statutes "into conformity with the Federal Adoption and Safe Families Act to allow federal funding to continue" and to "clarify" rather than to change existing law. See 43rd Legis.2d Reg. Sess.1998, Minutes of the House Human Services Committee, February 19, 1998; Minutes of the Senate Family Services Committee, April 22, 1998. As a clarification of the law, the amendment applied retroactively to mother's case. See State v. Sweet, 143 Ariz. 266, 269, 693 P.2d 921, 924 (1985) (amendment that clarified statute is legislative declaration of the original act). Therefore, the juvenile court was not statutorily required to make this determination in a severance based solely on grounds of abandonment pursuant to A.R.S. § 8–533(B)(1).

¶ 10 We acknowledge that this court has recently reached a different result in a case involving termination on grounds of mental illness pursuant to A.R.S. § 8–533(B)(2). See Mary Ellen C. v. Arizona Dept. of Econ. Sec., 193 Ariz. 185, 971 P.2d 1046 (App.1999). That case, however, did not involve grounds of abandonment and did not address the

legislative changes discussed above.[2]

¶ 11 In *Mary Ellen C.*, the question before us was whether the state was required to make reasonable efforts to reunify the family before seeking severance on the statutory basis that the parent suffers "a mental illness of prolonged and indefinite duration." *Id.* at 191, 971 P.2d at 1052; *see* A.R.S. § 8–533(B)(3). We noted that the requirement that ADES make an effort to reunify the family was mandated on constitutional grounds, based on "the fundamental liberty interest of the natural parents in the care, custody and management of their child." *Id.*, at 192, 971 P.2d at 1053 (quoting *Santosky v. Kramer*, 455 U.S. 745, 753, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982)). We concluded:

> In short, because fundamental interests are no less involved in mental-illness-based severances than in others, the principle is no less applicable in mental-illness based severances than in others that "termination of the parent-child relationship should not be considered a panacea but should be resorted to only when concerted effort to preserve the relationship fails." ... This principle does not oblige the State to undertake rehabilitative measures that are futile.... It does, however, oblige the State to undertake measures with a reasonable prospect of success.

*Mary Ellen C.*, at 192, 971 P.2d at 1053 (citations omitted). Thus, we concluded, in order to terminate parental rights, ADES is required to prove, by clear and convincing evidence, that "it had made a reasonable effort to provide [the mother] with rehabilitative services or that such an effort would be futile." *Id.*, at 193, 971 P.2d at 1054.[3]

¶ 12 In this case, therefore, although we have concluded that ADES was not required to make an attempt to reunify this family to establish the statutory ground of abandonment, we must also consider whether the same conclusion withstands constitutional analysis.

¶ 13 The United States Supreme Court has long recognized that the fundamental right of parents to the care, custody, and control of their children is protected by the due process clause of the United States Constitution. *Santosky v. Kramer*, 455 U.S. at 753, 102 S.Ct. 1388. However, the Court has also recognized that "the mere existence of a biological link does not merit equivalent constitutional protection." *Lehr v. Robertson*, 463 U.S. 248, 258, 103 S.Ct. 2985, 77 L.Ed.2d 614 (1983). In *Lehr*, the court found no due process violation from a New York adoption procedure that failed to give notice to an unwed father who had "never had any significant custodial, personal, or financial relationship [with his child], and he did not seek to establish a legal tie until after she was two years old." *Id.* at 262, 103 S.Ct. 2985. The Court reasoned:

> The significance of the biological connection is that it offers the natural father an opportunity that no other male possesses to develop a relationship with his offspring. If he grasps that opportunity and accepts some measure of responsibility for the child's future, he may enjoy the blessings of the parent-child relationship and make uniquely valuable contributions to the child's development. If he fails to do so, the Federal Constitution will not automatically compel a State to listen to his opinion of where the child's best interests lie.

*Id.* Thus, in *Lehr*, because the biological father had a nonexistent relationship with the child, and had not "come forward to participate in the rearing of his child," his constitutional rights were not violated by lack of notice before adoption of the child. 463 U.S. at 256, 103 S.Ct. 2985. *See also Caban v. Mohammed*, 441 U.S. 380, 397, 99 S.Ct. 1760, 60 L.Ed.2d 297 (1979) ("Parental rights do not spring full-blown from the biological connection between parent and child. They require relationships more enduring.").

¶ 14 Although this lesser protection has been applied to date only in the context of unwed biological fathers, we see no reason

---

2. The 1997 and 1998 legislative changes to A.R.S. § 8–533 at issue here had not been enacted at the time of the relevant event in *Mary Ellen C.*; thus, they had no impact on that decision.

3. In *Mary Ellen C.*, we also found this requirement inherent in the statutory grounds of A.R.S. § 8–533(B)(3), which applied to that case but is not relevant in this case.

why it should not be equally applicable to an unwed biological mother who similarly forms no custodial, personal, or financial relationship with the child, under circumstances that meet the statutory ground of abandonment in A.R.S. § 8–533(B)(1).[4] The parent-child relationship under such circumstances is equally devoid of "the full commitment to the responsibilities of parenthood" that warrants substantial protection of the parental interests under the due process clause. *Lehr*, 463 U.S. at 261, 103 S.Ct. 2985 (quoting *Caban*, 441 U.S. at 381, 99 S.Ct. 1760). In finding no distinction between the rights of unmarried mothers and unmarried fathers, the Court noted in *Caban:*

> [M]aternal and paternal roles are not invariably different in importance. Even if unwed mothers as a class were closer than unwed fathers to their newborn infants, this generalization concerning parent-child relations would become less acceptable as a basis for legislative distinctions as the age of the child increased.

441 U.S. at 389, 99 S.Ct. 1760. Thus, we find no reason to afford a biological mother who abandons her child at birth any greater constitutional rights than we would afford a biological father under the same circumstances.

■ ¶ 15 In the absence of such a parental relationship, a biological parent's interest in the child is nothing more than a genetic link, unaffected by a termination of parental rights. *See Lehr*, 463 U.S. at 261, 103 S.Ct. 2985 ("The actions of judges neither create nor sever genetic links.") We conclude that, given this lesser constitutional standard in the absence of an existing parent-child relationship, the mother was not entitled, based on constitutional due process principles, to require ADES to provide her with reunification services before seeking severance of her rights on the statutory ground of abandonment.

■ ¶ 16 Mother also argues that, at a minimum, ADES has a duty to make a diligent effort to locate a parent before terminating the parental relationship on grounds of abandonment. In this case, we conclude that the evidence supports the juvenile court's finding that "DES/CPS exercised due diligence in attempting to locate the Mother, given the circumstances of her being homeless and [on] probationary status." ADES served mother with a temporary custody notice at the time they removed the child, searched the files on her other children for a current address, located and contacted relatives in Tucson, checked utility records and local phone directories, and made two investigation requests, which included a search of local law enforcement agencies. When the results of the second investigation request were returned with a possible Tucson address, ADES sent a certified letter to mother, which was returned as undeliverable. The caseworker testified that, had the mother contacted ADES, she would have been provided with appropriate services. This evidence is sufficient to support the juvenile court's finding that ADES made diligent attempts to locate the mother before filing the severance petition.

### 2. *Sufficiency of Evidence of Abandonment*

¶ 17 The mother also argues that the trial court's finding that she abandoned her child was not supported by the evidence. Although she admits a failure to provide support, to maintain regular contact, and to maintain a parental relationship with the child, mother contends this failure was not accompanied by an intent to abandon the child "without just cause." *See* A.R.S. § 8–531(1) (defining "abandonment"). Mother alleges that, at the time of the child's birth, she was experiencing mental difficulties that made her unaware of the child's existence until later, and that she was unaware of the child's whereabouts until November 1997,

---

**4.** "Abandonment" is statutorily defined as "the failure of a parent to provide reasonable support and to maintain regular contact with the child, including normal supervision. Abandonment includes a judicial finding that a parent has made only minimal efforts to support and communicate with the child. Failure to maintain a normal parental relationship with the child without just cause for a period of six months constitutes prima facie evidence of abandonment." A.R.S. § 8–531(1).

when served with the severance petition while in jail.

¶ 18 We agree with ADES that the mother's conduct in this case establishes the requisite intent to abandon without just cause. *See Pima County Juv. Severance Action No. S–114487*, 179 Ariz. 86, 97, 876 P.2d 1121, 1132 (1994) (where parent had assumed no parental duties and no parental relationship came into existence, "the message, simply put, is this: do something, because conduct speaks louder than words or subjective intent"). Mother admitted that, when released from the hospital, she knew she had given birth to a baby. Although she believed her baby was being kept there because he was sick, she made no effort to see him or locate him, either during the next four months she spent in a shelter or during the period of incarceration that began in May 1996. Although she contended she did not know that ADES had custody of the child, she made no attempts to determine who did. After a period of mental confusion while incarcerated, she felt "competent" again, but did not ask anyone to help her locate the child because "I was just emotionally trying to take care of myself at that time."

¶ 19 Our supreme court has held that, when "circumstances prevent [an] unwed father from exercising traditional methods of bonding with his child, he must act persistently to establish the relationship however possible and must vigorously assert his legal rights to the extent necessary." *S–114487*, 179 Ariz. at 97, 876 P.2d at 1132. To determine "whether an unwed father who has never had a relationship with his child has protected his rights, we judge abandonment by conduct, *not* by subjective intent." *Id.* (emphasis in original). We see no reason not to apply this standard to this case, where the biological mother has never formed a bond with the child and asserts a lack of knowledge about the child's existence for a period of time. *See also JS–8490*, 179 Ariz. at 106, 876 P.2d at 1141 (where unwed father "has reasonable grounds to know that he might have fathered a child, he must protect his parental rights by investigating the possibility and acting appropriately on the information he uncovers"). The burden of action is on the parent, in both situations, "to promptly and persistently grasp the opportunity to develop a relationship" with the child and to assert legal parental rights. *S–114487*, 179 Ariz. at 99, 876 P.2d at 1134. In the absence of such action, intent to abandon without just cause is inferred from the inaction. *JS–8490*, 179 Ariz. at 107, 876 P.2d at 1142. The juvenile court's finding of abandonment therefore is supported by the record and is not clearly erroneous.

¶ 20 For the foregoing reasons, we affirm the juvenile court's order terminating mother's parental rights to the child.

CONCURRING: JEFFERSON L. LANKFORD, Presiding Judge, and CECIL B. PATTERSON, JR., Judge.