NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

JOSHUA W., *Appellant*,

*v.*

DEPARTMENT OF CHILD SAFETY, F.T., *Appellees*.

No. 1 CA-JV 16-0405
FILED 3-28-2017

Appeal from the Superior Court in Maricopa County
No. JD28887
The Honorable Sally S. Duncan, Judge

**AFFIRMED**

COUNSEL

John L. Popilek, P.C., Scottsdale
By John L. Popilek
*Counsel for Appellant*

Arizona Attorney General's Office, Phoenix
By JoAnn Falgout
*Counsel for Appellee Department of Child Safety*

**MEMORANDUM DECISION**

Judge Lawrence F. Winthrop delivered the decision of the Court, in which
Presiding Judge Randall M. Howe and Judge Jon W. Thompson joined.

**W I N T H R O P**, Judge:

¶1 Joshua W. ("Father"), the alleged biological father of F.T. ("the child"), appeals the juvenile court's order terminating his parental rights to the child on the ground of abandonment.[1] Father argues the court erred in terminating his rights because the Department of Child Safety ("DCS") failed to provide him with a paternity test, which he maintains effectively denied him the right to reasonable efforts at reunification. Although we disapprove of DCS's meager efforts to obtain a paternity test, because Father made no reasonable efforts of his own to obtain such a test or to establish a normal parental relationship with the child, we nonetheless affirm.

### FACTS AND PROCEDURAL HISTORY[2]

¶2 The child was born in July 2011. On August 4, 2014, the child was found wandering the streets alone while wearing only a diaper. Mother was unable to parent the child or the child's half-sister, E.T., due to substance abuse—primarily methamphetamine—and serious mental illness—having been diagnosed with a bipolar disorder and schizophrenia—as well as intellectual disabilities.[3] Father was incarcerated in the Arizona Department of Corrections and not scheduled to be released until sometime in 2015; accordingly, DCS took the child into care and filed a dependency petition on August 6, 2014. DCS alleged the child was dependent as to Father due to Father's incarceration and because he had abandoned and neglected her by failing to maintain a normal parental relationship and provide her with basic necessities.

---

[1] The juvenile court also terminated the parental rights of the child's mother ("Mother"). Mother separately appealed the termination of her parental rights and is not a party to this appeal.

[2] We view the facts and reasonable inferences therefrom in the light most favorable to affirming the juvenile court's order. *Ariz. Dep't of Econ. Sec. v. Matthew L.*, 223 Ariz. 547, 549, ¶ 7, 225 P.3d 604, 606 (App. 2010).

[3] Mother has a substantial history of reports to DCS and its predecessor agency, Child Protective Services (a former division of the Arizona Department of Economic Security ("ADES")), as well as a prior dependency and severance case.

¶3            The court appointed counsel to represent Father, and a team decision-making meeting was held on August 17, 2014. Father attended the meeting telephonically from prison and agreed to DCS's request that he submit to a paternity test; however, more than two years would pass before paternity testing was conducted in late August 2016.

¶4            Father appeared telephonically at the September 10, 2014 initial dependency hearing and the November 3, 2014 pretrial conference hearing. Although Father contested the dependency, the record does not reflect he inquired about or requested the paternity test at either hearing.[4]

¶5            At the time of the May 28, 2015 dependency adjudication hearing, Father remained imprisoned—with a maximum end date of September 26, 2015—based on convictions for credit card fraud, burglary, and possession or use of marijuana. He appeared telephonically at the dependency adjudication hearing, waived his right to contest the allegations in the petition, and submitted the issue of dependency to the court. The court found the child dependent as to Father, set a case plan of family reunification, and advised Father to participate in any services available to him while in custody and to send cards, gifts, or letters to the child through DCS. The court also "urged" Father to contact DCS immediately upon his release so that DCS could offer urinalysis testing, a referral for a TERROS assessment, supervised visitation, and "additional services as deemed appropriate." The record does not indicate that Father voiced any objection regarding the offered services or inquired about paternity testing at that time. Moreover, over approximately the next year, Father made no effort to arrange for paternity testing, maintain a normal relationship with the child, or contact the child, even after his release from incarceration in July 2015 or after subsequent releases from incarceration.

¶6            In November 2015, Father failed to appear at a report and review hearing, and although Father was represented by counsel at the

---

[4]      The September and November 2014 hearings were digitally recorded, as were the subsequent hearings in May and November 2015 and May 2016, but transcripts of those hearings were not provided in the record on appeal. Father therefore suggests that DCS's reliance on the court's minute entries of these hearings is unreliable. However, as the appellant, Father bears the burden to ensure the record on appeal contains all transcripts or other documents he contends are necessary for us to consider the issues raised. *See Baker v. Baker*, 183 Ariz. 70, 73, 900 P.2d 764, 767 (App. 1995); ARCAP 11(c)(1)(A)-(B).

hearing, the record again provides no indication that Father requested or objected to the lack of a paternity test through counsel. The juvenile court ordered the case plan changed to severance and adoption, and on November 25, 2015, DCS filed a motion to terminate the parents' rights. As to Father, DCS alleged the statutory ground of abandonment as a basis for severance. *See* Ariz. Rev. Stat. ("A.R.S.") § 8-533(B)(1) (Supp. 2016).[5]

¶7            In February and May 2016, Father was located and served at the Maricopa County Jail, where he was by that time again incarcerated. On May 3, 2016, the juvenile court held an initial hearing on the motion for termination. Father was transported to and present at the hearing, and stated that he wished to contest the severance. The court ordered DCS to obtain a paternity test for him on an expedited basis.[6] By this time, the child had been in DCS's legal care for approximately twenty-one months.

¶8            In May and June 2016, Father wrote a few cards and letters to the child, and sent them to the DCS case manager; however, the letters he sent were "inappropriate" and could not be forwarded to the child.[7] Before that, he had failed to maintain contact with the child since the dependency or to pay any support for her.

¶9            Although DCS eventually collected DNA samples from Father and the child in late August 2016, the results of the paternity testing were not available as of the hearing on the motion for termination. Accordingly, both the case manager and Father were questioned at that hearing about the lack of a paternity test and about why the test had not been completed.

---

[5]       We cite the current version of the statute because no changes material to our analysis have occurred since the date of severance.

[6]       It appears from our review of the record that this was the first time the court actually ordered paternity testing. Also, the court's minute entry does not reflect any claim by Father that the lack of a paternity test had in any way prevented him from exercising his parental rights or performing his parental responsibilities.

[7]       The record is unclear whether Father sent the cards and letters in 2015 or 2016. Father contends—and the context of the testimony primarily supports—that the letters were sent in 2016; in any event, the specific date does not affect our decision.

¶10       At the September 1, 2016 hearing on the motion for termination, the DCS case manager testified that Father had provided no food, clothing, shelter, medical care, or other support for the child, and had not provided for her educational or social needs, or otherwise parented her. The case manager also acknowledged that no paternity test results were available, and therefore Father continued to be the child's "alleged father." When asked about the delay in paternity testing, the case manager attributed the two-year delay to difficulty in locating Father, explaining that "[t]here were several parent locates put out for him." At the same time, however, the case manager, who had recently been assigned the case in June 2016, acknowledged the case had been staffed by "four or five" previous case managers since its inception and conceded that DCS had known of Father's in-custody status for much of that time.

¶11       Although Father remained incarcerated due to pending criminal charges at the time of the hearing, he was transferred to the court and testified.[8] Father admitted knowing about the child before the dependency case was filed and affirmed that he considered her to be his biological daughter; nevertheless, he admitted he had done nothing to establish paternity or a relationship with her before she was taken into DCS's care. He further admitted knowing the child was in DCS's care as of August 17, 2014, but that he did nothing to contact her or establish a relationship with her at that time. He also acknowledged that, other than the cards and letters he sent to the child shortly before the severance hearing, he had sent no correspondence, had not provided financial support for the child, and had not attempted to maintain a relationship with her throughout the dependency, even during the time periods when he was not incarcerated.

¶12       When asked about the lack of a paternity test, Father explained he had agreed to DCS's August 2014 request that he submit to a paternity test; however, he claimed to have subsequently "lost [the] contact information" and admittedly made no effort to follow up on the request. Father also testified that after his release from prison in July 2015, he went back to jail within a month-and-a-half, was released for another eighteen days before briefly being re-incarcerated, and then was released for "like six months" before returning to the Maricopa County Jail. He explained

---

[8]       The record reflects that the pending charges include sexual assault and aggravated assault causing serious physical injury. Father's criminal case has not yet been adjudicated. *See State v. Bearup*, 221 Ariz. 163, 174, ¶ 58, 211 P.3d 684, 695 (2009) (taking judicial notice of superior court records).

that, during that time, he "had lost all the paperwork" and thus could not contact DCS.  However, he further admitted that "it was a bad time and to be honest, I really wasn't trying to be the father that I could be."

¶13         Father's attorney waived closing argument, and at the close of the hearing, the juvenile court granted DCS's motion to terminate Father's parental rights to the child on the ground of abandonment.[9]  In explaining its decision, the court stated in part as follows:

>         As to [Father] . . . , the Court finds that [Father] failed to maintain a normal parental-child (sic) relationship without just cause, failed to provide reasonable support, regular contact and normal supervision.

>         There were a couple of cards and letters sent, no gifts, not sufficient enough and letters were inappropriate so they could not be forwarded, but a last ditch effort to try to communicate with a child is not a normal parental relationship.

>         Father has been incarcerated steadily but has had . . . enough time out of custody to have initiated paternity proceedings to assert that he is actually the biological father.

>         At one point in time you indicated you were out of custody for six months, that's more than enough time to have initiated it on your own; I do believe [DCS] delayed as well, but you have an obligation as a parent to assert your paternity and you failed to do that.

¶14         Father filed a timely notice of appeal.  We have jurisdiction pursuant to A.R.S. § 8-235(A) (2014) and Rule 103(A) of the Arizona Rules of Procedure for the Juvenile Court.

## ANALYSIS

*I.     Standard of Review*

¶15         A parent possesses a fundamental liberty interest in the care, custody, and management of his children.  *Kent K. v. Bobby M.*, 210 Ariz.

---

9        The court also ordered that "the paternity results [] be disclosed once they're in, immediately."  The record on appeal does not indicate the results of the paternity testing.

279, 284, ¶ 24, 110 P.3d 1013, 1018 (2005) (citing *Santosky v. Kramer*, 455 U.S. 745, 753 (1982); *Michael J. v. Ariz. Dep't of Econ. Sec.*, 196 Ariz. 246, 248, ¶ 11, 995 P.2d 682, 684 (2000)). Even fundamental rights are not absolute, however. *Id.* (citing *Michael J.*, 196 Ariz. at 248, ¶ 12, 995 P.2d at 684). A court may sever those rights if it finds clear and convincing evidence of one of the statutory grounds for severance, and finds by a preponderance of the evidence that severance is in the child's best interest. *See* A.R.S. §§ 8-533(B), -537(B) (2014); *Kent K.*, 210 Ariz. at 281–82, 288, ¶¶ 7, 41, 110 P.3d at 1015–16, 1022.

**¶16**　　　　The juvenile court retains great discretion in weighing and balancing the interests of the child, parent, and state. *Cochise Cty. Juv. Action No. 5666-J*, 133 Ariz. 157, 160, 650 P.2d 459, 462 (1982). As the trier of fact in a termination proceeding, the juvenile court "is in the best position to weigh the evidence, observe the parties, judge the credibility of witnesses, and resolve disputed facts." *Jordan C. v. Ariz. Dep't of Econ. Sec.*, 223 Ariz. 86, 93, ¶ 18, 219 P.3d 296, 303 (App. 2009) (quoting *Ariz. Dep't of Econ. Sec. v. Oscar O.*, 209 Ariz. 332, 334, ¶ 4, 100 P.3d 943, 945 (App. 2004)). Thus, the resolution of conflicts in the evidence is uniquely the province of the juvenile court, and we will not reweigh the evidence in our review. *Jesus M. v. Ariz. Dep't of Econ. Sec.*, 203 Ariz. 278, 282, ¶ 12, 53 P.3d 203, 207 (App. 2002); *see also Pima Cty. Adoption of B-6355*, 118 Ariz. 111, 115, 575 P.2d 310, 314 (1978) ("In considering the evidence it is well settled that an appellate court will not substitute its own opinion for that of the trial court." (citation omitted)).

**¶17**　　　　We will not disturb the juvenile court's order absent an abuse of discretion or unless no reasonable evidence supports its factual findings. *Matthew L.*, 223 Ariz. at 549, ¶ 7, 225 P.3d at 606; *Mary Lou C. v. Ariz. Dep't of Econ. Sec.*, 207 Ariz. 43, 47, ¶ 8, 83 P.3d 43, 47 (App. 2004). In reviewing the juvenile court's decision to terminate parental rights, we review *de novo* questions of law and the court's legal determinations, including the application of a statute or rule. *See Manuel M. v. Ariz. Dep't of Econ. Sec.*, 218 Ariz. 205, 210, ¶ 18, 181 P.3d 1126, 1131 (App. 2008); *Ariz. Dep't of Econ. Sec. v. Ciana H.*, 191 Ariz. 339, 341-42, 955 P.2d 977, 979-80 (App. 1998); *Maricopa Cty. Juv. Action No. JV-507879*, 181 Ariz. 246, 247, 889 P.2d 39, 40 (App. 1995).

**¶18**　　　　Under A.R.S. § 8-533(B)(1), the juvenile court may terminate parental rights if "the parent has abandoned the child." Abandonment is defined as "the failure of a parent to provide reasonable support and to maintain regular contact with the child, including providing normal supervision," and "includes a judicial finding that a parent has made only minimal efforts to support and communicate with the child." A.R.S. § 8-

531(1) (Supp. 2016). "Failure to maintain a normal parental relationship with the child without just cause for a period of six months constitutes prima facie evidence of abandonment." *Id.*

## II. *Father's Argument Regarding Paternity Testing*

¶19 In this case, Father has not directly challenged the juvenile court's factual findings or legal conclusions that DCS proved the statutory elements required to sever his rights on the abandonment ground under A.R.S. § 8-533(B)(1),[10] and reasonable evidence supports the court's findings. The court's severance order is supported by clear and convincing evidence under the statutory ground of abandonment.

¶20 Father nonetheless argues that the juvenile court erred in terminating his parental rights. According to Father, DCS's failure to promptly obtain paternity test results means that DCS failed to make reasonable or diligent efforts to provide appropriate reunification services.

¶21 The State argues that Father has waived this argument by apparently failing to raise it throughout the underlying dependency proceedings and by failing to make it during closing argument. *See generally Shawanee S. v. Ariz. Dep't of Econ. Sec.*, 234 Ariz. 174, 178-79, ¶¶ 16, 18, 319 P.3d 236, 240-41 (App. 2014) (holding that a parent waived her claim that ADES did not make diligent efforts to provide appropriate reunification services by raising it for the first time on appeal); *Bennigno R. v. Ariz. Dep't of Econ. Sec.*, 233 Ariz. 345, 349, ¶ 19, 312 P.3d 861, 865 (App. 2013) (holding that a parent waived his claim that ADES did not make diligent efforts to provide appropriate reunification services by failing to request additional services before the second severance hearing); *but see Christina G. v. Ariz. Dep't of Econ. Sec.*, 227 Ariz. 231, 235 n.8, ¶ 15, 256 P.3d 628, 632 n.8 (App. 2011) (declining to apply waiver to a mother's argument challenging ADES's failure to make diligent efforts because ADES did not raise the issue of waiver on appeal).

¶22 Even assuming *arguendo* that Father has not waived his argument, Father's argument fails because the juvenile court was not required to find that DCS provided Father with a paternity test or other reasonable reunification services before terminating his parental rights on the ground of abandonment. Father does not argue that DCS had a statutory or constitutional obligation to provide reunification services such

---

[10] We therefore may treat the accuracy of these findings as conceded on appeal. *See Britz v. Kinsvater*, 87 Ariz. 385, 388, 351 P.2d 986, 987 (1960).

as paternity testing to Father before seeking to terminate his parental rights on the ground of abandonment—and, indeed, no such obligation exists. *See Toni W. v. Ariz. Dep't of Econ. Sec.*, 196 Ariz. 61, 66, ¶ 15, 993 P.2d 462, 467 (App. 1999); *see also Michael J.*, 196 Ariz. at 251, ¶ 25, 995 P.2d at 687 (holding that, in an abandonment case, "ADES owed no duty to [the parent] to ensure that his parental rights were not severed," and "[t]he burden to act as a parent rests with the parent, who should assert his legal rights at the first and every opportunity" (citation omitted)); *Bobby G. v. Ariz. Dep't of Econ. Sec.*, 219 Ariz. 506, 510, ¶ 11, 200 P.3d 1003, 1007 (App. 2008) ("[N]either § 8-533 nor federal law requires that a parent be provided reunification services before the court may terminate the parent's rights on the ground of abandonment." (citing *Toni W.*, 196 Ariz. at 64, ¶¶ 7–9, 993 P.2d at 465)).

¶23        Nevertheless, Father argues that "even if [DCS] did not have a constitutional or statutory obligation to provide at least this minimal service [paternity testing] to Father, it certainly had a court-ordered obligation to do so." *See generally Matthew L.*, 223 Ariz. 551, ¶ 21, 225 P.3d at 608 (noting that "ADES was under a court-ordered duty to provide [the father] with a paternity test and a psychological evaluation"). Father claims that if he was not the child's biological father, then he had no obligation to act as a parent, and thus, a paternity test was required before he could be faulted for not establishing a relationship with the child.

¶24        We agree that DCS was dilatory in conducting the paternity testing; however, on this record, we cannot say the juvenile court abused its discretion in terminating Father's parental rights to the child. Despite believing the child was his, Father failed to put forth efforts to establish and maintain a parent-child relationship. Even if a putative father does not know with certainty that a child is his, he "must grasp his opportunity to develop a relationship with his child." *Maricopa Cty. Juv. Action No. JS-8490*, 179 Ariz. 102, 106, 876 P.2d 1137, 1141 (1994) (citation omitted). "This includes investigating the possibility that the child might be his." *Id.* Confirmation of paternity through testing is not required before a parent is obligated to assert his rights as a parent to avoid losing those rights. *See id.* ("[I]f a man has reasonable grounds to know that he might have fathered a child, he must protect his parental rights by investigating the possibility and acting appropriately on the information he uncovers."). Moreover, even if DCS does not provide paternity testing, the obligation falls upon the putative parent to follow through with such testing. *See id.*

¶25        In this case, Father admitted he knew about the child before the dependency case was filed and that he considered her to be his

daughter, but he nevertheless did nothing to establish paternity. Father claimed it was difficult or impossible for him to establish paternity because he was incarcerated for much of the dependency proceedings and because he "had lost all the paperwork." But Father had reasonable grounds to know he might have fathered a child, and therefore was obligated to protect his parental rights and grasp his opportunity to develop a relationship with his child. *See id.* Father admitted, however, that, other than a few cards and letters sent shortly before the severance hearing, he did not attempt to communicate with the child, to provide support, or to otherwise maintain a normal relationship with her. In addition, Father admitted that it was not the lack of a formal paternity test that dissuaded him from exercising his parental rights and performing his parental obligations—instead, as he conceded, "it was a bad time and to be honest, I really wasn't trying to be the father that I could be."

¶26 Finally, relying on *Calvin B. v. Brittany B.*, 232 Ariz. 292, 304 P.3d 1115 (App. 2013), Father argues that circumstances may exist, such as a mother's efforts to disrupt a relationship between a father and his child, that must be considered in determining whether a parent has abandoned a child. Father's reliance on *Calvin B.* is unavailing. *Calvin B.* involved active efforts by a child's mother to sabotage the relationship between a father and child, *see id.* at 296-97, ¶ 21, 304 P.3d 1119-20, and is therefore distinguishable. Here, neither DCS nor anyone else made active efforts to restrict the relationship between Father and the child. Moreover, unlike the father in *Calvin B.*, who consistently and "'vigorously assert[ed] his legal rights' to see his [child]," *id.* at 298, ¶ 29, 304 P.3d at 1121 (quoting *Michael J.*, 196 Ariz. at 250, ¶ 22, 995 P.2d at 686), Father has done little in this case to establish or maintain a parent-child relationship. On this record, Father's claim that the juvenile court erred by terminating his parental rights fails, even though DCS did not conduct the court-ordered paternity test in a timely fashion.

### III. Best Interest

¶27 Father does not challenge the juvenile court's finding that severance was in the child's best interest; however, we note that the record supports the finding. The court found and the record demonstrates the affirmative benefits of permanency, stability, and safety available to the child from severance. *See Maricopa Cty. Juv. Action No. JS–500274*, 167 Ariz. 1, 6, 804 P.2d 730, 735 (1990); *Oscar O.*, 209 Ariz. at 334, ¶ 6, 100 P.3d at 945. The record indicates the child has had recent health and dental examinations, is healthy, and is receiving individual counseling. Further, the child is adoptable, and the child's foster placement is meeting the child's

social, medical, psychological, and educational needs and is willing to adopt the child. *See Audra T. v. Ariz. Dep't of Econ. Sec.*, 194 Ariz. 376, 377, ¶ 5, 982 P.2d 1290, 1291 (App. 1998).

**CONCLUSION**

**¶28**        Although we disapprove of DCS's failure to provide a timely paternity test in this case, the juvenile court's order terminating Father's parental rights to the child is affirmed.



AMY M. WOOD • Clerk of the Court
FILED:  AA