NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
## DIVISION ONE

IN RE TERMINATION OF PARENTAL RIGHTS AS TO H.B.

No. 1 CA-JV 25-0182

FILED 06-16-2026

Appeal from the Superior Court in Maricopa County
No. JD535618
JS521397
The Honorable Peter A. Thompson, Judge

**AFFIRMED**

COUNSEL

Vierling Law Offices, Phoenix
By Thomas A. Vierling
*Counsel for Appellant*

Arizona Attorney General's Office, Phoenix
By Jennifer R. Blum
*Counsel for Department of Child Safety*

**MEMORANDUM DECISION**

Judge Brian Y. Furuya delivered the decision of the Court, in which Presiding Judge Andrew M. Jacobs and Judge James B. Morse Jr. joined.

**F U R U Y A**, Judge:

**¶1**        Markus K. ("Father") appeals the termination of his parental rights as to H.B. He argues insufficient evidence supports the court's findings and the court erred by misapplying *Michael J. v. Department of Economic Security*, 196 Ariz. 246 (2000). For the following reasons, we affirm.

**FACTS AND PROCEDURAL HISTORY**

**¶2**        H.B. was born substance-exposed on December 24, 2023. At the time, Father was incarcerated and paternity was unknown. About two weeks later, the Department of Child Safety ("DCS") took custody of H.B. and alleged dependency as to Justine B. ("Mother") and Father, who were not married. Four days later, Father was released from prison.

**¶3**        By March 2024, Father knew DCS was involved with H.B. but did not know where DCS had placed H.B. DCS unsuccessfully attempted to contact Father multiple times. Around October 2024, Father reached out to DCS and requested to be involved with H.B.'s case. But when DCS again tried to contact Father, he did not respond. Father was arrested the following month, and in March 2025, he was sentenced to 4.5 years in prison, followed by 3 years of probation.

**¶4**        In May 2025, after locating Father in prison, DCS filed a Motion for Genetic Testing. The court granted the motion, and the test established Father's probability of paternity as 99.9999%. Two months later, DCS moved for summary judgment on the issue of paternity, which the court granted.

**¶5**        That same month, DCS also filed petitions to terminate Father's and Mother's[1] parental rights to H.B. As to Father, DCS alleged he abandoned H.B. and the length of his sentence would deprive H.B. of a normal home for a period of years. *See* A.R.S. § 8-533(B)(1), (4). DCS also alleged that termination of Father's parental rights was in H.B.'s best

_____

[1]        Mother is not a party to this appeal.

interests because "it would further the plan of adoption, which would provide [H.B.] with permanency and stability."

**¶6**        In October 2025, the court held a combined dependency and termination hearing. The court found H.B. dependent as to Father and terminated his parental rights. In doing so, the court found Father abandoned H.B. by making no efforts to "establish his constitutional rights to his child" and that Father's sentence is of a length that will deprive H.B. of a normal home. The court also found that termination of Father's rights was in H.B.'s best interests because it would promote permanency and stability in H.B.'s life.

**¶7**        On November 14, 2025, Father filed a premature notice of appeal. We stayed the appeal and permitted Father to seek relief for his untimely appeal in the superior court, pursuant to Arizona Rule of Procedure for the Juvenile Court 603(a)(5)(A). Father subsequently filed a Motion to Allow a Notice of Appeal Nunc Pro Tunc, which the court granted on January 13, 2026.

**¶8**        We have jurisdiction pursuant to Article 6, Section 9 of the Arizona Constitution and Arizona Revised Statutes ("A.R.S.") Sections 8-235, 12-120.21(A), and -2101(A)(1).

## DISCUSSION

**¶9**        Father argues the court erred because there was insufficient evidence to support either termination ground and the court misapplied a factor in its length-of-sentence analysis.

**¶10**        The court may terminate a parent-child relationship if it finds by clear and convincing evidence at least one statutory ground for termination and by a preponderance of the evidence that termination is in the child's best interests. A.R.S. § 8-533(B); *Jessie D. v. Dep't of Child Safety*, 251 Ariz. 574, 579 ¶ 8 (2021). We review the juvenile court's decision to terminate parental rights for abuse of discretion. *Jessie D.*, 251 Ariz. at 579 ¶ 10. We will affirm unless there is no reasonable evidence to support the court's findings. *Id.*

**¶11**        When the court finds termination is justified under multiple statutory grounds, "we will affirm the termination if any one of the statutory grounds is proven[.]" *Raymond F. v. Ariz. Dep't of Econ. Sec.*, 224 Ariz. 373, 376 ¶ 14 (App. 2010). Because we conclude there is reasonable evidence supporting the court's finding of abandonment, we need not address Father's arguments regarding the length-of-sentence ground.

Further, because Father did not challenge the court's best-interest finding, we will not address it. *Crystal E. v. Dep't of Child Safety*, 241 Ariz. 576, 577–78 ¶ 5 (App. 2017) (noting failure to raise an argument on appeal results in waiver).

**¶12** Under A.R.S. Section 8-533(B)(1), the court may terminate a parent-child relationship if it finds the parent has abandoned the child. Abandonment is defined as:

> [T]he failure of a parent to provide reasonable support and to maintain regular contact with the child, including providing normal supervision. Abandonment includes a judicial finding that a parent has made only minimal efforts to support and communicate with the child.

A.R.S. § 8-531(1). "[A]bandonment is measured not by a parent's subjective intent, but by the parent's conduct . . . ." *Michael J.*, 196 Ariz. at 249 ¶ 18.

**¶13** "[A]n unwed father with no existing parental relationship must act quickly and persistently after the child's birth to take whatever steps are reasonably possible to develop a parental relationship." *Maricopa Cnty. Juv. Action No. JS-8490*, 179 Ariz. 102, 105 (1994); *see also Lehr v. Robertson*, 463 U.S. 248, 261 (1983) (noting that only after unwed fathers "demonstrate[] a full commitment to the responsibilities of parenthood . . . may it be said that he acts as a father toward his children" (citation modified)). He must also "vigorously assert his legal rights to the extent necessary." *Pima Cnty. Juv. Severance Action No. S-114487*, 179 Ariz. 86, 97 (1994).

**¶14** Father argues he was not H.B.'s parent before his paternity was established in July 2025, and therefore, his conduct before that time was not subject to analysis under the abandonment statutes. He then claims the evidence of abandonment was insufficient because the court could not rely on evidence before paternity was established.

**¶15** In coming to this conclusion, Father relies on *In re G.R.*, 255 Ariz. 444 (App. 2023), where we concluded the court erred in adjudicating G.R. dependent as to the father without first establishing paternity. *In re G.R.*, 255 Ariz. at 449 ¶ 30. But in that case, we limited our holding to dependency proceedings, *id.* at 448 ¶ 22, so Father's reliance on it is misplaced. Here, although the court held a combined dependency and termination proceeding, Father did not appeal the court's finding of dependency. Thus, *In re G.R.* is inapplicable.

¶16     We also decline to extend our ruling in *In re G.R.* because another case is instructive on this issue. In *Maricopa County Juvenile Action No. JS-8490*, our supreme court held that an unwed father abandoned his child even though he "did not know with certainty that the child was his[.]" 179 Ariz. at 106. In that case, the mother became pregnant after having sexual relations with both the father and another man. *Id.* at 104. The father claimed he was unaware of the mother's pregnancy and she moved away before the child was born. *Id.* The father learned about the child shortly after her birth but did not receive confirmation that he was the father until about two years later when he ran into the mother. *Id.* When the father's parental rights were terminated on the ground of abandonment two years later, father appealed and argued there was insufficient evidence of abandonment because he "did not have sufficient reason to believe that he had a child[.]" *Id.* at 105.

¶17     Our supreme court disagreed, concluding "that if a man has reasonable grounds to know that he might have fathered a child, he must protect his parental rights by investigating the possibility and acting appropriately on the information he uncovers." *Id.* at 106. Relying on evidence both before and after paternity was established through the father's chance encounter with the mother, our supreme court affirmed the trial court's finding of abandonment because the evidence showed the father did not "t[ake] any action to ascertain [his] true relationship" with the child. *Id.* at 106–07.

¶18     Here too, the record does not show Father "act[ed] quickly and persistently" to develop a parental relationship with H.B. *Id.* at 105. Father testified that in June 2023 he knew Mother was pregnant and that by March 2024—two months after he was released from prison—he knew H.B. was in DCS custody. He also testified that when he heard H.B. was in DCS custody, "[he] knew absolutely that there was a possibility" he was H.B.'s father.

¶19     The record does not indicate that Father attempted to establish paternity, and Father does not dispute the court's finding that while he was incarcerated, he "paid no support; sent no cards, gifts, or letters; or made any contact whatsoever with [H.B.]" *See Michael J.*, 196 Ariz. at 251 ¶ 24 (concluding incarcerated father did not try to establish a bond when he did not request letters, phone calls, pictures, or knowledge of how the child was doing). Further, Father does not dispute the court's finding that after he reached out to DCS to get involved in H.B.'s case, he did not return DCS's attempts to contact him. Father notes he appeared at the court hearings after paternity was established, but such conduct "is not action,

[but] merely reaction." *Maricopa Cnty. Juv. Action No. JS-8490*, 179 Ariz. at 107 (explaining coming forward after learning about the child's impending adoption was not evidence that father wanted a relationship). Father knew about H.B. more than a year prior to establishment of his paternity, he admitted he knew there was a possibility he was H.B.'s father, and he did not make a persistent effort to establish a relationship with H.B. Thus, there is reasonable evidence supporting the court's finding of abandonment.

**¶20**　　　　Our conclusion is further supported by the language of A.R.S. Section 8-533. The legislature identified several grounds that justify the termination of a parent-child relationship and included certain grounds that apply when paternity has not been established. *See, e.g.*, A.R.S. §§ 8-533(B)(5) (permitting termination of parental rights when potential father fails to file timely paternity action); -533(B)(6) (permitting termination when putative father fails to file notice of paternity claim); -533(B)(9) (permitting termination when parent's identity is unknown following diligent efforts); -533(F) (stating alleged parent's failure to take a test "to determine if the person is the child's natural parent is prima facie evidence of abandonment"). These subsections make clear that the absence of established paternity is not an automatic defense to the termination of parental rights. And more specifically, they suggest that absence of established paternity does not necessarily preclude the court from considering services provided to the putative parent during the period before paternity is established for purposes of termination proceedings.

**¶21**　　　　Thus, we conclude the court did not err in finding Father abandoned H.B. and affirm the termination of Father's parental rights.

**CONCLUSION**

**¶22**　　　　We affirm.



**MATTHEW J. MARTIN • Clerk of the Court**
**FILED**:　　　　JR