NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
## DIVISION ONE

LYNDA H., *Appellant*,

*v.*

DEPARTMENT OF CHILD SAFETY, J.S., *Appellees*.

No. 1 CA-JV 17-0130
FILED 10-24-2017

Appeal from the Superior Court in Maricopa County
No. JD29316
The Honorable Alison Bachus, Judge

**AFFIRMED**

COUNSEL

Law Office of H. Clark Jones, LLC, Mesa
By Clark Jones
*Counsel for Appellant*

Arizona Attorney General's Office, Tucson
By Cathleen E. Fuller
*Counsel for Appellee Department of Child Safety*

---

**MEMORANDUM DECISION**

Judge Maria Elena Cruz delivered the decision of the Court, in which Presiding Judge Lawrence F. Winthrop and Judge Diane M. Johnsen joined.

---

**C R U Z**, Judge:

**¶1**        Lynda H. ("Mother") appeals from the superior court's order terminating her parental rights, challenging only the court's finding that the Department of Child Safety ("DCS") made diligent efforts to provide appropriate reunification services.  We affirm.

## FACTUAL AND PROCEDURAL HISTORY

**¶2**        Mother and Derick S. ("Father")[1] are the biological parents of J.S., who was born in December 2011.[2]  Mother conceived J.S. by way of artificial insemination while she was in a relationship with Sherilynn B-S. In June 2014, when J.S. was two years old, DCS received reports that Mother had been handling J.S. roughly and that she refused to take him for medical care related to his ears.  Mother and her partner Sherilynn had been in a verbal altercation and Mother left with J.S.; when Mother returned, J.S. had dried blood around his ears from scratching and was crying.  DCS took no action concerning these reports.

**¶3**        In early October 2014, DCS received a report that Mother had been seen smacking J.S. and pulling him by his arm down the street.  The report also described another incident in which Mother's adult son, John H., yelled at J.S. and pushed him to the floor.  When Sherilynn confronted Mother and told her John could no longer stay in their house, Mother pulled glass picture frames off the wall and threw them toward where J.S. was

---

[1]        Father is deceased and is not a party to this appeal.

[2]        Mother is the biological parent of five other children, two of them adults, one of which lived with her at the time of severance, but her parental rights were terminated to them in another state due to child abuse and neglect, and they are not parties to this appeal.

standing, causing Sherilynn to pick up J.S. to prevent him from being harmed. Mother then charged at Sherilynn, pushing her to the floor while Sherilynn was holding J.S.

¶4        On October 19, 2014, DCS took temporary custody of J.S.[3] During its investigation, DCS received reports that Mother was impatient and physically abusive with J.S. and that John had a history of animal cruelty and inappropriate sexual acts. Mother denied being aggressive towards J.S., and noted that although John had a history of mental illnesses and animal cruelty, she did not believe he posed a danger to J.S.

¶5        On October 22, 2014, DCS filed a dependency action, alleging: Mother committed domestic violence against Sherilynn in the presence of J.S.; Mother neglected J.S. by failing to protect him from John; Mother physically and emotionally abused J.S.; and she failed to provide him with the basic necessities of life. DCS expressed concern that Mother had suffered a childhood brain injury that could contribute to her impulsive control and anger issues.

¶6        At the preliminary protective hearing, DCS offered Mother individual counseling with a domestic violence component, parent-aide services, a case aide, and recommended a psychiatric evaluation, for which Mother would self-refer. The goals of the services were to help Mother address her aggression and violent tendencies and to learn how to better protect J.S. for his safety and well-being. DCS also requested a psychological consultation.

¶7        In November 2014, Mother completed her psychiatric evaluation with Southwest Behavioral Health Services ("SBHS"). She was diagnosed with an adjustment disorder with depressed mood, a parent-child relational problem, and a partner relational problem. Mother enrolled in parenting classes and individual counseling at SBHS, and signed up with New Horizons Counseling Service for "domestic violence/parenting treatment/education."

¶8        In March 2015, the court adjudicated J.S. dependent as to Mother on all grounds except for the allegation that Mother physically abused J.S.

¶9        In April 2015, the case manager reported DCS had completed a psychological consultation of Mother and was awaiting the results. Based

---

3        Sherilynn moved to intervene and her intervention was granted in May 2015. J.S. has since been in her care.

on the results of that report, DCS requested Mother complete another psychological evaluation in July 2015 with Dr. Mansfield-Blair. Dr. Mansfield-Blair diagnosed Mother in September 2015 with borderline personality disorder and gave her a rule-out diagnosis of post-traumatic stress disorder ("PTSD"), which the psychologist opined would likely interfere with Mother's ability to parent effectively. Dr. Mansfield-Blair opined Mother's prognosis was "relatively poor," and highlighted concerns regarding Mother's ability to care for J.S., particularly with her grown adult children moving back into her life and Mother's past difficulties in child-rearing. Dr. Mansfield-Blair recommended Mother participate in "long-term therapy," specifically Dialectical Behavioral Therapy ("DBT"). Dr. Mansfield-Blair raised concerns that Mother was defensive during the evaluation, sought to downplay her responsibility in domestic and child-rearing issues, and concluded Mother was "not likely to be able to fully address her parenting issues without first identifying and acknowledging her own core issues and addressing those issues . . . ."

¶10         In October 2015, the case manager reported Mother had not been regularly participating in the one-on-one sessions with the parent aide, a "component necessary for the successful completion of parent aide services." The case manager also sent Mother a letter explaining the services she should complete, including domestic violence classes for perpetrators, and urged her to contact her "health insurance provider as soon as possible to arrange for the therapeutic course of treatment . . . recommended in [her] psychological evaluation."

¶11         In November 2015, Mother was advised by the psychologist who performed her evaluation that she could seek DBT therapy through SBHS. While Mother made efforts to obtain DBT services through self-referral, the case manager also initiated a DBT referral.

¶12         Over the next few months, Mother missed almost half of her one-on-one sessions with the parent aide, did not complete her domestic violence coursework, and failed to confirm parent-aide sessions ahead of time. When the parent aide attempted to review with Mother the effects of domestic violence on Mother's children, Mother became upset and raised her voice, claiming she was the victim of violence at the hands of Sherilynn. From June 2015 to January 2016, the parent aide noted Mother made no progress towards changing her behavior regarding violence or safety; however, the parent aide did note Mother had good interactions with J.S. and appropriately redirected him. The parent-aide services were closed in January 2016 due to Mother's failure to complete the one-on-one sessions. The aide noted that while Mother completed visitations, she was unwilling

to engage in one-on-one parenting sessions to complete parenting education and work on behavioral changes.

¶13 In early January 2016, Mother's counsel informed the case manager that SBHS was no longer offering DBT and counsel requested information about other providers. Mother's counsel also noted Mother had attempted to self-refer for domestic violence counseling but needed a referral. After receiving no response, in late January 2016, Mother's counsel again contacted the case manager with concerns. The case manager submitted a new referral for domestic violence counseling, although the referral had not been processed by early February. The case manager then relayed a response that Mother should seek DBT through the Arizona Health Care Cost Containment System or her own insurance as it would be quicker, and offered to submit a referral if Mother needed it. In early February, Mother's counsel again advised the case manager that Mother needed a referral to begin DBT counseling.

¶14 In March, Mother reiterated her need for a referral for DBT, suggesting the referral also include domestic violence counseling as well. DCS issued the referral on March 24, although Mother had not been assigned providers by early April.

¶15 On April 16, 2016, Mother moved to exclude not less than fifteen months from the time J.S. had been in out-of-home placement for purposes of Arizona Revised Statutes ("A.R.S.") section 8-533(B)(8)(c), and requested the court find DCS had failed during that period to make reasonable and diligent efforts to provide appropriate reunification services. The State filed no opposition, and the court granted the motion on May 20, 2016. The State then filed an untimely opposition, arguing the appropriate remedy was to require DCS to provide appropriate services, not to exclude time from out-of-home care. The State moved to terminate Mother's parental rights on July 19, 2016. J.S.'s guardian ad litem ("GAL") joined with the State, agreeing that it was not in J.S.'s best interest to delay permanency by excluding time, and the appropriate judicial process would be to litigate these issues at a severance trial. J.S.'s placement joined with the State and GAL on both points. In August, the superior court set all pending matters for disposition at the severance trial, and ordered DCS to provide Mother with the second phase of DBT (group therapy) on an expedited basis.

¶16 Mother, meanwhile, had begun DBT (individual therapy) with a domestic violence component with Dr. Capps-Conkle at Buwalda Psychological Services in late May. In Mother's self-assessment, completed

for DBT in May 2016, she disagreed with her diagnosis of PTSD and stated she was the victim of domestic violence, was participating because the court ordered her to do so, and had been told she had to stay with her abuser. During that same time, Mother missed three consecutive weeks of visits with J.S., and was involved in another domestic-violence incident with a subsequent domestic partner.

¶17 After DCS expedited its referral, Mother began participating in the group portion of DBT therapy. In November 2016, the case manager reported Mother continued to deny her behaviors, blame others, and to insist she was the victim, not the perpetrator. In addition, it was noted by the DCS case manager that Mother's adult children were living with her, a concern for DCS considering her adult children's past incidents of harmful behavior.[4]

¶18 Mother's contested severance hearing took place over four days in December 2016 and January 2017. Sherilynn testified that during her relationship with Mother, she had not known that Mother's adult sons had past histories of harmful behavior, and Mother's partner from February to April 2016 testified she once caught John naked on the backside of her daughter. Mother's partner further testified Mother had picked up the partner's son, then approximately eight years old, and tossed him on the bed, spanked the partner's children, and constantly screamed at them. Mother's partner also stated she had set up Mother to attend DBT counseling in about mid-February 2016, but Mother refused to go. Mother denied many of the accusations against her.

¶19 The DBT therapist, Dr. Capps-Conkle, noted that her treatment of Mother was based on Mother's self-reporting. She disagreed with Mother's prior personality disorder diagnosis, but testified Mother could eventually present with a personality disorder, and agreed with the PTSD diagnosis. Dr. Capps-Conkle felt Mother still needed another three or four months of DBT treatment, noting that such treatment could have already been completed had Mother started the DBT counseling earlier.

¶20 The superior court terminated Mother's rights based on the fifteen-month out-of-home placement ground of A.R.S. § 8-533(B)(8)(c) and found DCS "provided Mother with appropriate services that were tailored to her needs." The court denied Mother's motion to exclude time in care

---

[4] In addition to her son John's past inappropriate and violent behaviors, Mother's son, Robert, had sexually assaulted Sherilynn's granddaughter.

due to DCS's purported delay in providing reunification services, made detailed findings supporting its determination that DCS had made diligent efforts, and found no unreasonable delay in either the psychological evaluation or the referral for DBT. Finally, the court found termination was in the best interest of the child.

**¶21**      Mother timely appealed from the court's order, and this Court has jurisdiction pursuant to A.R.S. §§ 8-235(A), 12-2101(A), and 12-120.21(A).

## DISCUSSION

**¶22**      We review the superior court's order terminating a parent's rights for an abuse of discretion. *Mary Lou C. v. Ariz. Dep't of Econ. Sec.*, 207 Ariz. 43, 47, ¶ 8 (App. 2004). We view the evidence and any reasonable inferences in the light most favorable to sustaining the court's decision, and will affirm a termination order that is supported by reasonable evidence. *Jordan C. v. Ariz. Dep't of Econ. Sec.*, 223 Ariz. 86, 93, ¶ 18 (App. 2009).

**¶23**      Parents "have a fundamental right to raise their children as they see fit, but that right is not without limitation." *Minh T. v. Ariz. Dep't of Econ. Sec.*, 202 Ariz. 76, 79, ¶ 14 (App. 2001). A court may sever those rights if it finds by clear and convincing evidence that one of the statutory grounds for severance is met, and finds by a preponderance of the evidence that severance is in the best interest of the child. A.R.S. § 8-533(B); *Kent K. v. Bobby M.*, 210 Ariz. 279, 284, ¶ 22 (2005).

**¶24**      Termination of parental rights based on fifteen-months out-of-home placement requires a finding that the child has been in an out-of-home placement for fifteen months or longer, the parent has been unable to remedy the circumstances that caused the child's out-of-home placement, and there exists a substantial likelihood the parent will be incapable of exercising proper and effective parental care and control in the near future. A.R.S. § 8-533(B)(8)(c). Pursuant to A.R.S. § 8-533(B)(8), DCS also must show it has made a diligent effort to provide appropriate reunification services. *See Jordan C.*, 223 Ariz. at 93, ¶ 19. DCS is not required to provide every conceivable service or undertake rehabilitative measures that are futile, but it must offer measures that will provide a parent the time and opportunity to participate in programs with a reasonable prospect of success in reunifying the family. *Id.* at 94, ¶ 20.

**¶25**      Mother argues the court erred by finding DCS made requisite efforts to reunify the family, arguing DCS delayed offering her DBT even though the psychologist concluded she needed such therapy. DCS fails to

"make a 'concerted effort to preserve' the parent-child relationship when it neglects to offer the very services that its consulting expert recommends." *Mary Ellen C. v. Ariz. Dep't of Econ. Sec.*, 193 Ariz. 185, 192, ¶ 37 (App. 1999).

**¶26** In *Mary Ellen C.*, the caseworker identified a lack of improvement in the parent's mental health as the primary basis for the decision to seek severance, yet did so without checking the parent's records and sought severance before providing the parent a psychiatric evaluation. *Id.* at 193, ¶ 39. In that case, the court found the State made only a "negligible effort" to learn what services the parent was receiving or how she was progressing, and neglected to secure necessary psychiatric information for the doctor who conducted the psychological evaluation, yet relied upon his assessment of the parent to support severance. *Id.* The court further found the State failed to inform the doctor that the parent had participated fully in all services offered, and the State offered no evidence to rebut the parent's evidence of progress. *Id.* at ¶ 40. The doctor's opinion that the parent would not improve was based on his own misconception that the State had offered the parent the intensive psychiatric services that had been recommended. *Id.* at ¶ 41. In that case the court found the State's effort to be "belated, fitful, and indifferent," concluding that because of its negligible efforts the State "failed to establish by clear and convincing evidence that it made a reasonable effort to preserve [the] family . . . ." *Id.* at 192-94, ¶¶ 38-44.

**¶27** In contrast to *Mary Ellen C.*, more than reasonable and sufficient evidence supports the superior court's finding here that DCS made diligent efforts to reunify the family. The court made detailed factual findings regarding the adequacy of services DCS provided, such as case management, a psychiatric evaluation, parent-aide sessions, parenting classes, domestic-violence counseling (both before DBT and then as part of her DBT counseling), psychological evaluations, and counseling. The court found Mother's psychological evaluation was not unreasonably delayed, as Mother underwent a psychiatric evaluation, then a psychological consultation, before it was recommended that a formal psychological evaluation be conducted. The court noted the three-month delay between the referral and psychological evaluation, but found such delay was not due to a lack of reasonable efforts by DCS, and we agree. DCS provided referrals for evaluations and consultations as required or requested, to provide Mother with as many services as would help reunify her with J.S. The results of the psychological evaluation were provided to Mother in September 2015, and in October DCS emailed Mother advising her to refer for needed services, such as DBT. The case manager initially referred Mother for DBT in November 2015, and although that referral was delayed,

Mother did not reach out to the case manager for alternative services until January. At that time, DCS advised Mother a self-referral would be quicker, but offered the option to refer if requested. Mother requested a referral for DBT in February and was referred in March. The court found a one-and-a-half-month delay was not unreasonable, and we also note that when her partner helped get the DBT therapy scheduled, Mother refused to go.

¶28        In any event, based on ample evidence, the court also found:

> [A]ny delay with DBT for Mother did not delay reunification, because . . . Mother has not been forthcoming with Dr. Capps-Conkle. Mother's lack of candor with her therapist has undermined the ability of the treatment to deal with the issues that Mother must address to safely parent [J.S.]. If DBT had started earlier, Mother's denials about her role in domestic violence simply would have started earlier (and continued during treatment, as noted above).

In sum, in contrast to the situation in *Mary Ellen C.*, the efforts DCS provided here were not unreasonable, nor "belated, fitful, and indifferent." 193 Ariz. at 193, ¶ 38.

¶29        Further, although Mother challenges the court's diligent-efforts determination with respect to the psychological evaluation and DBT referral, we cannot ignore that Mother failed to complete the parent-aide services DCS offered her, regularly denied responsibility for the events leading up to the dependency and severance petitions, and failed to change her behavior, as noted by the court in its order.

¶30        Because reasonable evidence supports the court's diligent-efforts determination, the court did not abuse its discretion in terminating Mother's parental rights to J.S. Mother does not challenge the court's order terminating her parental rights on any other basis; the evidence in the record supports the court's statutory basis for termination and its best interest findings.

¶31        The superior court found DCS met its burden in proving the fifteen-month out-of-home placement statutory ground by clear and convincing evidence. J.S. was removed from Mother's care in October 2014, well in excess of fifteen months. Mother denied being the perpetrator of domestic violence, downplayed or denied the extent of her own conduct, all of which compromised her ability to address the reasons why J.S. was

removed from her care. Mother continually placed children in her care at risk by allowing her adult sons to have access to them, even though she was fully aware of their past behavioral, physical, and sexual problems. The court found there was a substantial likelihood that Mother would be unable to exercise proper and effective parental care and control in the near future, based on her continued denial of her history of perpetrating violence and failure to address the risks her adult children posed to J.S. The court considered Mother's argument that Mother's outbursts were attributed to the delay in DBT counseling, but disagreed, finding "even after participating in months of DBT, [Mother] continued the pattern of deception she demonstrated throughout this case; specifically, Mother was far from candid during her testimony and attempted to minimize (or deny) her conduct."

¶32 The court additionally found DCS met its burden by proving by a preponderance of the evidence that severance was in J.S.'s best interest. To establish that severance would be in the child's best interest, the court must find either that the child will benefit from termination or that the child will be harmed by continuation of the parental relationship. *Ariz. Dep't of Econ. Sec. v. Oscar O.*, 209 Ariz. 332, 334, ¶ 6 (App. 2004). To determine whether the child would benefit, the court should consider relevant factors such as whether the current placement is meeting the child's needs, *Maricopa Cty. Juv. Action No. JS-8490*, 179 Ariz. 102, 107 (1994), whether the child is adoptable, and whether there is an adoption plan in place for the child. *Oscar O.*, 209 Ariz. at 334, ¶ 6.

¶33 The superior court found J.S. was placed with an intervenor who had been a parental figure throughout J.S.'s life. The court found the intervenor had gone "above and beyond" in caring for all of J.S.'s needs, was willing to adopt J.S., and J.S. would benefit from severance because he would be placed in a home free from Mother's outbursts and domestic violence. The court heard testimony from Mother that she loved J.S. and had bonded; however, the existence of a bond is not determinative, *see Dominique M. v. Dep't of Child Safety*, 240 Ariz. 96, 98-99, ¶ 12 (App. 2016), and the evidence presented supported the determination that severance of Mother's parental rights would provide J.S. with permanency and stability and it would be otherwise detrimental to J.S. if Mother were permitted to maintain the parent-child relationship.

**CONCLUSION**

¶34 Sufficient evidence supported the superior court's finding that DCS made diligent efforts to provide Mother with reasonable

10

rehabilitative services and the other findings it made in severing Mother's parental rights.  We therefore affirm the court's order.



AMY M. WOOD • Clerk of the Court
FILED:  AA