NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

---

IN RE
TERMINATION OF PARENTAL RIGHTS AS TO N.R.

No. 1 CA-JV 22-0184
FILED 2-7-2023

---

Appeal from the Superior Court in Mohave County
No. S8015JD202100028
The Honorable Aaron Michael Demke, Judge, *Pro Tempore*

**AFFIRMED**

---

COUNSEL

Harris & Winger, P.C., Flagstaff
By Sarah Snelling
*Counsel for Appellant Daniel R.*

Arizona Attorney General's Office, Tucson
By Dawn R. Williams
*Counsel for Appellee Department of Child Safety*

---

## MEMORANDUM DECISION

Presiding Judge Brian Y. Furuya delivered the decision of the Court, in which Judge Jennifer B. Campbell and Judge Paul J. McMurdie joined.

---

**F U R U Y A**, Judge:

**¶1**        Daniel R. ("Father") appeals the juvenile court's order terminating his parental rights to his minor child ("N.R.").[1] Father challenges the juvenile court's finding that he substantially neglected or willfully refused to remedy the circumstances that caused N.R. to be in an out-of-home placement for six months or longer due to Father's failure to participate in reunification services offered by the Department of Child Safety ("DCS"). For the following reasons, we affirm.

### FACTS AND PROCEDURAL HISTORY

**¶2**        N.R. was born to Father and Mother in March 2021. After N.R. was born, DCS became "[c]oncern[ed] that [Mother] was not able to effectively parent" due to mental deficiencies and that Father "was not providing care." DCS determined Mother "was functioning at . . . [a] 9- to 10-year-old level" and "was unable to understand or respond to [N.R.'s] cues," creating concerns that "a child in Mother's care would be at risk of abuse or neglect." As a result, DCS implemented an in-home safety plan to provide Mother and Father with in-home services and protect N.R.

**¶3**        The DCS safety plan was intended to ensure that N.R. would never be left with Mother unattended. Under the safety plan, Father was required to supervise Mother when she was with N.R. and DCS offered daycare services during the time Father spent at work. The safety plan was only in place until June 2021 before DCS issued a report revealing Mother and Father were not in compliance. Instead of utilizing daycare as the safety plan contemplated, Father went to work and left N.R. unattended with Mother. In Father's absence, Mother had taken N.R. to a doctor's appointment and left him there for "close to an hour" while she went to retrieve a cell phone charger. As an apparent substitute for daycare or his supervision, Father had been using cameras installed in his home to watch

---

[1]        The parental rights of Jessica R. ("Mother") were also terminated, but she is not a party to this appeal.

Mother while he was at work and she was at home with N.R. However, Father's work was too distant from the home for this monitoring method to satisfy the supervision requirement of the safety plan effectively. Because Father failed to comply with the first safety plan, DCS did not believe implementing another safety plan would protect N.R. Instead, DCS removed N.R. from Mother and Father's care pursuant to a June 2021 court order.

¶4         DCS offered both Mother and Father services following N.R.'s removal. It recommended that Father complete a psychological consult and evaluation, Nurturing Parenting Program services, and asked Father to complete domestic violence education, anger management, individual counseling, and participate in supervised visits with N.R. Of the reunification services offered, Father completed only the psychological evaluation and an anger management program.

¶5         Father gave conflicting testimony throughout N.R.'s dependency and at trial regarding Mother's ability to safely parent N.R. on her own. For example, Father "recognize[d] that Mother needs supervision" if he is going to continue his relationship with her. However, at trial, it was noted that Father stated Mother was "a good mom." And although Father testified at trial that he would "ensure that if [Mother] visits, [N.R.] would be supervised," if N.R. was returned to in-home care, he subsequently stated that he believed Mother could parent N.R. on her own. Father also suggested during cross-examination that he did not believe DCS's safety plan requiring Mother's supervision was necessary:

> Q: And as you've just stated, you believe that [Mother] can care for the child. So you didn't think that safety plan was necessary. Is that a fair statement?
>
> A: I guess you could say that.

¶6         Following trial, the juvenile court terminated Father's parental rights on the six months' time-in-care grounds, finding DCS had "made a diligent effort to provide appropriate reunification services." The court further found that Father's participation in services was minimal, he did not understand the need for either services or the dependency itself, he had not made the necessary behavioral changes, and N.R. would not be safe if returned to his care.

¶7         Although Father had completed anger management, the court ultimately found by clear and convincing evidence that Father "substantially neglect[ed] or willfully refuse[d] to remedy the

circumstances that caused [N.R.] to be in an out-of-home placement by refusing to participate in reunification services." The court highlighted Father's failure to complete domestic violence counseling despite concerns regarding ongoing domestic violence between Father and Mother (ultimately resulting in a conviction during N.R.'s dependency). Crucially, the court found Father's denial of Mother's inability to safely parent N.R. presented a risk to N.R.'s health and safety. The court therefore concluded DCS had proven the grounds for termination by clear and convincing evidence. Finally, the court concluded DCS had proven by a preponderance of the evidence that termination would be in N.R.'s best interests and that he is adoptable despite his "various health concerns and developmental needs."[2] Father's parental rights were terminated pursuant to Arizona Revised Statutes ("A.R.S.") § 8-533(B)(8)(b).

¶8 Father timely appealed, and we have jurisdiction pursuant to Article 6, Section 9 of the Arizona Constitution and A.R.S. §§ 8-235(A), 12-120.21(A), and 12-2101(A).

## DISCUSSION

¶9 On appeal, we review the juvenile court's determination for abuse of discretion, *Mary Lou C. v. Ariz. Dep't of Econ. Sec.*, 207 Ariz. 43, 47 ¶ 8 (App. 2004) (citation omitted) and will affirm unless its findings were "clearly erroneous," meaning there was "no reasonable evidence to support them." *Xavier R. v. Joseph R.*, 230 Ariz. 96, 100 ¶ 11 (App. 2012) (citations omitted). We view the facts in the light most favorable to upholding the juvenile court's ruling. *Xavier R.*, 230 Ariz. at 99 ¶ 9 (citing *In re Maricopa Cnty. Juv. Action No. JS–8490*, 179 Ariz. 102, 106 (1994)). We do not reweigh the evidence on appeal. *Alma S. v. Dep't of Child Safety*, 245 Ariz. 146, 151 ¶ 18 (2018). Only the juvenile court may resolve conflicts in the evidence, even when the facts are "sharply disputed." *Id.* "[W]e must accept the juvenile court's findings if supported by reasonable evidence and inferences." *Brionna J. v. Dep't of Child Safety*, 253 Ariz. 271, 276 ¶ 24 (App. 2022).

¶10 To terminate a person's parental rights, the party seeking termination must establish one of A.R.S. § 8-533's statutory grounds by clear and convincing evidence and that termination would be in the child's best interests by a preponderance of the evidence. *Kent K. v. Bobby M.*, 210 Ariz. 279, 284 ¶ 22 (2005). The grounds for termination listed in A.R.S. § 8-

---

[2] N.R. has had some health concerns including a severe lip and tongue tie, problems keeping food down, and certain developmental delays. These issues have improved since being in the out-of-home placement.

533(B) "serve[] as a proxy for parental unfitness . . . that creates harm or risk of harm to the child." *Brionna J.*, 253 Ariz. at 277 ¶ 26 (citations omitted); *see also Alma S.*, 245 Ariz. at 150 ¶ 10 ("Eight of the eleven statutory grounds in [A.R.S.] § 8-533(B) are proxies for parental unfitness because they demonstrate a parent's inability to 'properly parent his/her child.'") (Citation omitted). In determining whether termination is appropriate, the court looks at the circumstances that caused the child to be in an out-of-home placement—as they exist at the time of termination—and which "prevent a parent from being able to appropriately provide for his or her children." *Brionna J.*, 253 Ariz. at 277 ¶ 26.

**¶11**　　　The parent-child relationship may be terminated when the child is under three years old and

> has been in an out-of-home placement for a cumulative total period of six months or longer pursuant to court order and the parent has substantially neglected or wil[l]fully refused to remedy the circumstances that cause the child to be in an out-of-home placement, including refusal to participate in reunification services offered by the department.

A.R.S. § 8-533(B)(8)(b). Although a parent is not required to have cured the circumstances leading to the child's out-of-home placement at the time of severance to avoid termination, *see Marina P. v. Ariz. Dep't of Econ. Sec.*, 214 Ariz. 326, 329–30 ¶ 21 (App. 2007) (citation omitted), termination is also "not limited to those who have *completely* neglected or willfully refused to remedy such circumstances." *In re Maricopa Cnty. Juv. Action No. JS-501568*, 177 Ariz. 571, 576 (App. 1994).

**¶12**　　　Here, Father argues the juvenile court abused its discretion by terminating his parental rights because he "made appreciable, good faith efforts to participate in services," noting both that he completed some of DCS's recommended services and the juvenile court's acknowledgment of his efforts.

**¶13**　　　At trial, DCS argued Father "willfully refused or substantially neglected to remedy the circumstances that caused [N.R.] to be in an out-of-home placement." DCS was particularly concerned with Father's failure to adequately oversee Mother, who could not safely parent N.R. unsupervised. Father acknowledged at trial that he needed to supervise Mother and "understood that she couldn't [parent] on her own." However, contrary to Father's acknowledgment that Mother required supervision to safely parent N.R., the juvenile court found Father violated the safety plan

and evidence was presented that this posed a risk to N.R. The juvenile court further found Father also failed to complete domestic violence counseling (although he did attempt to enroll the week prior to trial), told a service provider that he was "only taking [anger management classes] just to appease the courts," was unable to participate in the Nurturing Parenting Program after making "inappropriate comments to providers," and participated minimally in supervised visitation with N.R. Taken together, we conclude it was not an abuse of discretion for the juvenile court to find that Father had failed to remedy the circumstances which caused N.R. to be removed from his care.

**¶14** Father relies heavily on *Brionna J.*, in which we reversed a juvenile court order terminating a mother's parental rights, holding that "even abundant evidence of bad parenting does not necessarily equate to the parental unfitness necessary to justify permanent termination of the parent-child relationship by the state." *Brionna J.*, 253 Ariz. at 273 ¶ 1. There, Mother participated inconsistently in reunification services offered by DCS, failing to engage in several services entirely, resisting treatment, and behaving uncooperatively with service providers. *Id.* at 274 ¶¶ 6–10. On appeal, we concluded that while there was reasonable evidence supporting the juvenile court's findings as to Mother's resistance to services, there was insufficient evidence that she was statutorily unfit to parent her child. *Id.* at 277 ¶ 28. "The evidence established that Mother was mentally ill, volatile, and unkind, but it did not establish that she was unfit as a matter of law." *Id.* at 278 ¶ 29.

**¶15** This case is materially distinguishable from *Brionna J.* Here, the juvenile court terminated Father's parental rights under A.R.S. § 8-533(B)(8)(b), while N.R. was still only an infant. *See* A.R.S. § 8-533(B)(8)(b). By contrast, in *Brionna J.* the juvenile court terminated Mother's parental rights under a different subsection of § 8-533, and the child was already a teenager. *See Brionna J.*, 253 Ariz. at 273 ¶¶ 1–2; A.R.S. § 8-533(B)(8)(c). These subsections are governed by different standards and *Brionna J.* is therefore non-controlling and unpersuasive here. *Compare* A.R.S. § 8-533(B)(8)(b) (requiring a finding that the child is under three years of age, had been in an out-of-home placement for six months or longer, and that "the parent has substantially neglected or wil[l]fully refused to remedy the circumstances" causing the child's out-of-home placement), *with* § 8-533(B)(8)(c) (requiring a finding that the child had been in an out-of-home placement for fifteen months or longer and "the parent has been unable to remedy the circumstances that cause[d] the child to be in an out-of-home placement and there is a substantial likelihood that the parent will not be

capable of exercising proper and effective parental care and control in the near future.").

**¶16** Because sufficient evidence supports the juvenile court's determination that Father has failed to remedy the circumstances which led to N.R.'s out-of-home placement, we conclude that the court did not abuse its discretion in terminating Father's parental rights.

## CONCLUSION

**¶17** For the foregoing reasons, we affirm.



AMY M. WOOD • Clerk of the Court
FILED:        AA