NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

MICHAEL D., TURQUOISE P., *Appellants,*

*v.*

DEPARTMENT OF CHILD SAFETY, N.P., *Appellees.*

No. 1 CA-JV 22-0015
FILED 7-28-2022

Appeal from the Superior Court in Maricopa County
No. JD34221, JS519775
The Honorable Robert I. Brooks, Judge

**AFFIRMED**

COUNSEL

Maricopa County Legal Defender's Office, Phoenix
By Jamie R. Heller
*Counsel for Appellant, Father*

John L. Popilek, Scottsdale
*Counsel for Appellant, Mother*

Arizona Attorney General's Office, Tucson
By Autumn L. Spritzer
*Counsel for Appellees, Department of Child Safety*

---

**MEMORANDUM DECISION**

---

Presiding Judge Jennifer B. Campbell delivered the decision of the Court, in which Judge Randall M. Howe and Judge James B. Morse Jr. joined.

---

**C A M P B E L L**, Judge:

¶1        Turquoise P. (Mother) and Michael D. (Father) appeal the juvenile court's order terminating their parental rights to their daughter, Amy, on the grounds of abandonment and prior removal, respectively.[1] *See* A.R.S. § 8-533(B)(1), (11). Mother challenges the sufficiency of the evidence to support the court's finding on the abandonment ground, the reunification services provided to her, and court's denial of her motions for continuance. Father challenges the applicability of the prior removal ground and the sufficiency of the evidence to support it. And both Mother and Father challenge the court's finding that termination was in Amy's best interests. Because the record and law support the court's rulings, we affirm.

**BACKGROUND**

¶2        When Amy was born in April 2017, the Department of Child Safety (DCS) took her into custody, petitioned for dependency, and placed her with a foster family. Father appeared in the proceedings five months later and established paternity soon after.

¶3        The juvenile court adjudicated Amy dependent after Mother and Father pled no contest to the allegations. DCS then offered the parents substance-abuse testing and treatment, psychological evaluations, counseling and domestic-violence services, parenting classes, and visitation. Father participated in services, so DCS provided him with a family-reunification team. The court returned Amy to Father's custody and, in September 2019, eventually dismissed the dependency. Once Amy was returned to Father, her foster family moved to another state.

¶4        Within months, Father lost his job and sent Amy to live with her paternal great aunt (Aunt). Father maintained contact with Amy and provided her some support and necessities. Mother did not maintain contact with Amy or send her any cards, letters, gifts, or support.

---

[1]        We use a pseudonym to protect the identity of the minor child.

**¶5**        In November 2020, Aunt petitioned for a dependency. DCS joined as a co-petitioner, and the juvenile court eventually adjudicated Amy dependent after Mother and Father pled no contest. The court set the case plan as severance and adoption and relieved DCS from providing reunification services.

**¶6**        Father told DCS that he could not meet Amy's basic needs and wanted Aunt to adopt her. Aunt petitioned to terminate the parents' rights to Amy based on the grounds of abandonment, neglect, and Amy's prior removal. *See* A.R.S. § 8-533(B)(1), (2), (11). Afterwards, the juvenile court ordered DCS to provide Mother with a psychological evaluation, visitation, and transportation assistance, which DCS did.

**¶7**        Mother completed psychological evaluations with three providers who diagnosed her with various cognitive deficits; the providers agreed Mother's disability did not bar her from parenting Amy. DCS provided Mother with taxi service between Tucson and Phoenix, and she participated in most of the visits for the first few months of the dependency. She then refused almost all the visits during the next two months. Meanwhile, Father continued to visit Amy regularly at Aunt's home. Just before the termination hearing began, DCS referred Mother for the Family Connections program and referred Father to a parent aide, after he asked to participate in services.

**¶8**        The juvenile court held a two-day termination hearing beginning in September 2021 and ending in January 2022. Before the final day, DCS moved Amy to her maternal grandparents' home, under exigent circumstance, after receiving a serious allegation involving Aunt. When Amy's former foster family learned of the disruption, they returned to Arizona, intervened in the dependency, and moved for custody. Because the foster family was living with a relative and did not yet have a home in Arizona, they asked DCS to complete a home study on the relative. That home study was still pending when the termination hearing concluded. The court ultimately terminated Mother's parental rights under the abandonment ground and Father's rights under the prior removal ground, finding the remaining grounds unproven. A.R.S. § 8-533(B)(1), (11). The parents timely appealed.

## DISCUSSION

**¶9**        A parent's right to custody and control of his own child, while fundamental, is not absolute. *Michael J. v. Ariz. Dep't of Econ. Sec.*, 196 Ariz. 246, 248–49, ¶¶ 11–12 (2000). Severance of a parental relationship may be

warranted where the State proves one statutory ground under A.R.S. § 8-533 by "clear and convincing evidence." *Id.* ¶ 12. "Clear and convincing" means the grounds for termination are "highly probable or reasonably certain." *Kent K. v. Bobby M.*, 210 Ariz. 279, 284–85, ¶ 25 (2005). The court must also find that severance is in the child's best interests by a preponderance of the evidence. *Id.* at 288, ¶ 41.

**¶10**　　　　This court "will accept the juvenile court's findings of fact unless no reasonable evidence supports those findings, and we will affirm a severance order unless it is clearly erroneous." *Jesus M. v. Ariz. Dep't of Econ. Sec.*, 203 Ariz. 278, 280, ¶ 4 (App. 2002). This Court does not reweigh the evidence, but "look[s] only to determine if there is evidence to sustain the court's ruling." *Mary Lou C. v. Ariz. Dep't of Econ. Sec.*, 207 Ariz. 43, 47, ¶ 8 (App. 2004).

## I.　　Sufficiency of Evidence on Abandonment Ground

**¶11**　　　　Mother first argues DCS failed to prove she abandoned Amy. When a parent abandons a child, the juvenile court may terminate her parental rights. A.R.S. § 8-533(B)(1).

> "Abandonment" means the failure of a parent to provide reasonable support and to maintain regular contact with the child, including providing normal supervision. Abandonment includes a judicial finding that a parent has made only minimal efforts to support and communicate with the child. Failure to maintain a normal parental relationship with the child without just cause for a period of six months constitutes prima facie evidence of abandonment.

A.R.S. § 8-531(1). Abandonment is measured by a parent's conduct, not by her subjective intent. *Michael J.*, 196 Ariz. at 249, ¶ 18. At issue is "whether the parent has taken steps to establish and strengthen the emotional bonds linking . . . her with the child." *Kenneth B. v. Tina B.*, 226 Ariz. 33, 37, ¶ 21 (App. 2010).

**¶12**　　　　Reasonable evidence supports the juvenile court's finding that Mother abandoned Amy. Between September 2019 and January 2021, Mother had no contact with Amy, even though Aunt offered to facilitate visits. Nor did Mother send Amy any cards, letters, gifts, or support. Once the current dependency began, Mother had no consistent relationship with Amy. Mother engaged in some visits, provided a small amount of support, and sent a single birthday gift during the dependency. She, however, also cancelled visits, ended visits early, and refused several visits. And she

refused to communicate with Aunt to facilitate additional visits or other contact with Amy during the dependency. Overall, reasonable evidence supports the court's finding that Mother abandoned Amy and that her minimal efforts during this dependency fell short of establishing, developing, and maintaining a normal parent-child relationship with Amy.

¶13        Mother alternatively argues her abandonment was justified, claiming Father initially rebuffed her efforts to see Amy. The juvenile court found credible, however, Father and Aunt's testimony about their willingness to allow Mother to visit Amy. *See Jesus M.*, 203 Ariz. at 282, ¶ 12 ("The resolution of . . . conflicts in the evidence is uniquely the province of the juvenile court as the trier of fact; we do not re-weigh the evidence on review."). Despite their willingness, Mother took no meaningful actions to establish a relationship with the child. Indeed, Father asked Mother for financial assistance soon after he lost his job, while Amy was still in his custody, but Mother refused to help. And, as Mother acknowledged, she gave up on trying to contact Father about Amy while Amy was in his custody after one or two months; she did not file forms with the juvenile court to pursue visitation; and she did not pay financial support for Amy to Father or Aunt while Amy lived with them.

¶14        Mother also suggests her abandonment was justified because Aunt lived in Phoenix, which made visitation difficult, and because her learning disability prevented her from pursuing contact with Amy through family court. Neither argument explains how Father or Aunt restricted Mother from interacting with Amy, *cf. Calvin B. v. Brittany B.*, 232 Ariz. 292, 297, ¶ 22 (App. 2013) (father continuously and actively sought more involvement with son than mother would allow), and therefore do not justify her abandonment or explain her minimal efforts to maintain a relationship with Amy. Regarding the visitation forms, Mother testified she obtained them and "was having a hard time just going through [them]," but she never sought help from the court or Community Legal Services. On this record, Mother has shown no error.

## II.    Mother's Reunification Services

¶15        Mother next argues DCS failed to provide parenting skill sessions, which she suggests were constitutionally mandated. Considering this case's facts, we disagree. When a "biological mother . . . forms no custodial, personal, or financial relationship with the child, under circumstances that meet the statutory ground of abandonment[,] . . . [t]he parent-child relationship is . . . devoid of the 'full commitment to the responsibilities of parenthood' that warrants substantial protection of the

parental interests under the due process clause." *Toni W. v. Ariz. Dep't of Econ. Sec.*, 196 Ariz. 61, 66, ¶ 14 (App. 1999) (quoting *Lehr v. Robertson*, 463 U.S. 248, 261 (1983)).

**¶16**　　　　Here, Mother had never parented Amy, who was removed at birth. Amy was not returned to her care over the next four years, and, when Aunt petitioned for a dependency, it had been over a year since Mother had taken any actions to parent Amy or establish a relationship with the child. Thus, Mother lacked an existing parent-child relationship, and DCS was not constitutionally required to provide her reunification services before seeking to terminate her rights due to abandonment.

## III.　Denial of Mother's Motions for Continuance

**¶17**　　　　Mother next argues the juvenile court abused its discretion by denying her continuance motions, which would have allowed her more time to engage in parenting skill sessions. This Court "review[s] the grant or denial of a motion to continue for an abuse of discretion." *Sandretto v. Payson Healthcare Mgmt. Sys.*, 234 Ariz. 351, 361, ¶ 38 (App. 2014).

**¶18**　　　　Mother's argument is unpersuasive because DCS was not required to provide her with services, so the juvenile court's denial did not deprive her of a fair opportunity to present her case. Indeed, the court found that the "central issue . . . [was] not whether Mother has been able to engage in any parent skill building, but whether Mother has developed, established, and maintained a normal parent-child relationship." Mother had visitation available during the dependency, and the court found that evidence sufficient to judge her relationship with Amy. Additionally, DCS asked Mother to seek out parenting classes in the community, but she did not do so.

## IV.　Applicability of Prior-Removal Ground

**¶19**　　　　Father argues Amy was not removed from his legal custody as required by A.R.S. § 8-533(B)(11)(c). The juvenile court may terminate the parent-child relationship when all the following are proven by clear and convincing evidence:

　　(a) The child was cared for in an out-of-home placement pursuant to a court order.

　　(b) The agency responsible for the care of the child made diligent efforts to provide appropriate reunification services.

(c) The child, pursuant to court order, was returned to the legal custody of the parent from whom the child had been removed.

(d) Within eighteen months after the child was returned, pursuant to court order, the child was removed from that parent's legal custody, the child is being cared for in an out-of-home placement under the supervision of the juvenile court, the division or a licensed child welfare agency and the parent is currently unable to discharge parental responsibilities.

A.R.S. § 8-533(B)(11). Legal custody is defined as

(a) The right to have physical possession of the child.

(b) The right and the duty to protect, train and discipline the child.

(c) The responsibility to provide the child with adequate food, clothing, shelter, education and medical care . . . .

A.R.S. § 8-531(5).

¶20 Father argues Amy was not removed from his custody in the first dependency because he "had not yet established paternity and had no legal rights as to [Amy]" when DCS filed the initial dependency petition. In this manner, he urges this Court to interpret A.R.S. § 8-533(B)(11) as inapplicable to fathers who have not established paternity at the time the dependency petition is filed.

¶21 But the court removed Amy from Father's legal custody after he established paternity, satisfying A.R.S. § 8-533(B)(11)'s requirements. DCS petitioned for the initial dependency in April 2017, and Father established paternity to Amy through genetic testing about eight months later. When Father established paternity, his rights, including the "right to have physical possession of" and duties to Amy vested. *See* A.R.S. §§ 8-531(5), -531(10) (defining "parent" as "the natural or adoptive mother or father of a child"), 25-401 (defining "legal parent" as "a biological or adoptive parent whose parental rights have not been terminated," excluding "a person whose paternity has not been established pursuant to [A.R.S. §§] 25-812 or 25-814"), 25-814(A)(2) ("A man is presumed to be the father of the child if . . . [g]enetic testing affirms at least a ninety-five per cent probability of paternity").

7

¶22 Although Father's parental rights vested, he was not able to exercise them because Amy was already in the physical custody of her foster family. Nonetheless, that same day, the juvenile court adjudicated Amy dependent as to Father after he pled no contest to the dependency petition's allegations. The court therefore immediately curtailed Father's rights, effectively removing Amy from his custody, and ordered the child "committed to the care, custody and control of" DCS. Father's argument is unpersuasive.

## V. Sufficiency of Evidence for Prior Removal Ground

¶23 Alternatively, Father argues no reasonable evidence supports the court's finding that he was currently unable to discharge parental responsibilities as required under A.R.S. § 8-533(B)(11)(d). This court has explained:

> The term 'parental responsibilities' is capable of being understood by persons of ordinary intelligence as referring to those duties or obligations which a parent has with regard to his child. . . . The term is not intended to encompass any exclusive set of factors but rather to establish a standard which permits a trial judge flexibility in considering the unique circumstances of each termination case before determining the parent's ability to discharge his or her parental responsibilities.

*Maricopa Cnty. Juv. Action No. JS-5894*, 145 Ariz. 405, 408–09 (App. 1985) (internal citation and quotation omitted).

¶24 Reasonable evidence supports the court's finding that Father was currently unable to discharge his parental responsibilities. A month after the court dismissed the first dependency, Father recognized that he could not meet Amy's needs and sent her to live with Aunt. Although he visited Amy and provided some support over the next 14 months, he never indicated to Aunt that he could parent Amy full time, asked for her return, or otherwise pursued custody of her. Indeed, when Aunt petitioned for a dependency, Father told DCS he still could not meet Amy's basic needs because, by his own admission, "his bank account [was] overdrawn, he [did] not have food in [the] refrigerator, and he [was] not disciplined

8

enough to care for a child." At that time, he agreed with termination of his parental rights and told DCS he wanted Aunt to adopt her.[2]

¶25 Father then maintained that position through the first day of the termination hearing, vacillating only a few times. Nevertheless, based on his position, he chose not to participate in reunification services until several months into the dependency and had only just begun working with a parent aide by the start of the termination hearing. It was not until the termination hearing's final day, after Amy was removed from Aunt's care, that Father argued the child should be returned to him.

¶26 Commendably, Father made several improvements in his life and testified he was willing to engage fully in reunification services. But a last-minute willingness to engage fully does not rectify Father's acknowledged and long-standing inability to be Amy's primary caregiver. *Maricopa Cnty. Juv. Action No. JS-501568*, 177 Ariz. 571, 577 (App. 1994) ("Leaving the window of opportunity for remediation open indefinitely is not necessary, nor [is it] in the child's or the parent's best interests.").

¶27 Although Father was willing to commit to reunification by the final day of trial, he never indicated through testimony or evidence that he was currently prepared to be Amy's primary caregiver. Instead, he testified that having Amy placed with him was a "long-term goal" and that in the meantime, he wanted her placed with a foster family. Similarly, on the first day of trial, he had testified that placing Amy with Aunt "was the initial plan" to allow him to "get on [his] feet," but he never did, and "it ended up two years [went] by." *See Michael J.*, 196 Ariz. at 251, ¶ 25 ("The burden to act as a parent rests with the parent, who should assert his legal rights at the first and every opportunity"); *see also Raymond F. v. Ariz. Dep't of Econ. Sec.*, 224 Ariz. 373, 378, ¶ 25 (App. 2010) ("[C]hildren should not be forced to wait for their parent to grow up." (quotation omitted)). On this record, we find no error.

---

[2] Although Father agreed in theory with termination of his parental rights, he contested the termination motion. Father's main concern was whether Amy would be returned to Mother, who he believed was unfit to parent her. Essentially, Father asked the court to grant or deny the severance as to both parents. If the court denied severance, he wanted the opportunity to challenge any future placement with Mother.

## VI.     Best-Interests Finding

¶28       Both parents argue insufficient evidence supports the juvenile court's finding that termination was in Amy's best interests. In addition to finding a statutory ground for termination, the juvenile court must also determine that termination is in the child's best interests by a preponderance of the evidence. *Kent K.*, 210 Ariz. at 288, ¶ 41. Once the court finds a parent unfit under at least one statutory ground for termination, "the interests of the parent and child diverge," and the court proceeds to balance the unfit parent's "interest in the care and custody of his or her child" with "the independent and often adverse interests of the child in a safe and stable home life." *Id.* at 286, ¶ 35. "[A] determination of the child's best interest must include a finding as to how the child would benefit from a severance or be harmed by the continuation of the relationship." *Maricopa Cnty. Juv. Action No. JS-500274*, 167 Ariz. 1, 5 (1990). Courts "must consider the totality of the circumstances existing at the time of the severance determination, including the child's adoptability and the parent's rehabilitation." *Alma S. v. Dep't of Child Safety*, 245 Ariz. 146, 148, ¶ 1 (2018).

¶29       The court may find a child would benefit from termination if there is an adoption plan, the child is adoptable, *id.* at 150–51, ¶¶ 13–14, or if the child "would benefit psychologically from the stability an adoption would provide." *Maricopa Cnty. Juv. Action No. JS-501904*, 180 Ariz. 348, 352 (App. 1994). The court may also find a child will benefit from termination if an existing placement is meeting the child's needs and the child's prospective adoption is likely. *Demetrius L. v. Joshlynn F.*, 239 Ariz. 1, 4, ¶ 12 (2016). Conversely, the court may find a child would be harmed by the continuation of the parent-child relationship "where there is clear and convincing evidence of parental unfitness, which has not been remedied notwithstanding the provision of services by [DCS] and which detrimentally affects the child's well-being." *Pima Cnty. Juv. Action No. S-2460*, 162 Ariz. 156, 158 (App. 1989).

¶30       Here, the juvenile court determined Amy would benefit from severance, finding she "is adoptable" and "a prospective adoptive" family was seeking custody of her. The court found that that family had "a prior and significant relationship" with Amy and that termination would "enable the child to achieve permanency" after spending "most of her short life in the legal custody of the State."

¶31       Mother asserts the juvenile court ignored evidence of her rehabilitation efforts and points out that Amy was no longer in an adoptive

home when the termination hearing concluded. These points, however, do not undermine the court's findings that Amy was an adoptable child who needed permanency and that she would likely be placed with an adoptive family soon. *See JS-501904*, 180 Ariz. at 352 (DCS "need not show that it has a specific adoption plan before terminating a parent's rights").

¶32          The court heard evidence about Mother's rehabilitation efforts but found it did not outweigh other factors in support of severance. Additionally, the court expressly considered the fact that Amy was placed in a non-adoptive home, closer in proximity to Mother, which would make visitation between them easier. The court found these facts did not outweigh the "emotional strain and distress" Amy displayed after visits or "the amount of time [Amy] has been in [DCS's] custody between the two cases, her young age, the extensive work that would need to be done to reestablish a safe and healthy relationship, and [Amy's] need for stability and permanency." Reasonable evidence supports the court's findings, and we will not reweigh the evidence on appeal. *See Mary Lou C.*, 207 Ariz. at 47, ¶ 8.

¶33          Finally, in her reply brief, Mother takes issue with DCS's citation to events that occurred after the termination hearing, arguing correctly that evidence of Amy's prospective adoptive family was not elicited in the termination hearing through testimony or exhibits. This Court has not considered any records created after the termination hearing. *See John Munic Entrs., Inc. v. Laos*, 235 Ariz. 12, 20, ¶ 25 n.5 (App. 2014) ("If a fact is not in the record, we may not consider it."). Regardless, Amy's prospective adoptive family filed requests to intervene and assume custody of Amy before the termination hearing. Those documents are part of the case history and the record on appeal, and they support the court's findings. *See* Ariz. R.P. Juv. Ct. 104(D)(1)(b) (2013) ("The record on appeal . . . shall [include] . . . a certified copy of all pleadings, orders, and other documents filed with the clerk of the [juvenile] court.").

¶34          Father asserts the juvenile court had insufficient evidence of his relationship with Amy to make a best-interests determination. His argument is unpersuasive because the court found he had "a normal parent-child relationship" with Amy. Moreover, it was not Father's relationship or bond with Amy that was preventing reunification but his inability to perform daily parenting duties or be her primary caretaker. As the court concluded, "[i]t [wa]s not in [Amy's] best interest to continue this ongoing state of impermanence with neither parent able to provide for [her] in the near future."

**CONCLUSION**

¶35      For the foregoing reasons, we affirm the order terminating Father and Mother's parental rights.



AMY M. WOOD • Clerk of the Court
FILED:   AA