NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

---

IN RE TERMINATION OF PARENTAL RIGHTS AS TO B.B.

No. 1 CA-JV 23-0171
FILED 12-28-2023

---

Appeal from the Superior Court in Maricopa County
No. JD533554
The Honorable Joshua D. Rogers, Judge

**AFFIRMED**

---

COUNSEL

Robert D. Rosanelli Attorney at Law, Phoenix
By Robert D. Rosanelli
*Counsel for Appellant*

Arizona Attorney General's Office, Phoenix
By Emily M. Stokes
*Counsel for Appellee Department of Child Safety*

Amy Alexander, Esq., Chandler
By Amy Alexander
*Counsel for Appellee Child*

_____

**MEMORANDUM DECISION**

Judge Anni Hill Foster delivered the decision of the Court, in which Presiding Judge Jennifer B. Campbell and Judge Kent E. Cattani joined.

_____

**F O S T E R**, Judge:

¶1        M.M. ("Father") appeals a juvenile court order terminating his parental rights to B.B. ("Child"). For the following reasons, this Court affirms.

## FACTS AND PROCEDURAL HISTORY

¶2        Father and J.B. ("Mother") are the biological parents of Child, born in February 2012. A year later, Father was incarcerated and has been in and out of prison since that time. Father has been incarcerated for over half of Child's life and remains in custody today.

¶3        Child lived with Mother until January 2020, when Mother left Child in her sister's care because Mother was homeless and using drugs. Mother's sister never obtained any legal rights or responsibilities for Child. In August 2020, Mother gave birth to M.B. ("Sibling"), Child's half-sibling, who was substance exposed. Mother tested positive for opiates and amphetamines resulting in a referral to the Department of Child Services ("DCS"). As DCS investigated the family, Mother admitted she was transient and unable to care for Child and Sibling. Child was placed into the temporary legal care of DCS. Mother's parental rights were eventually terminated.

¶4        Because DCS could not locate any parent willing and able to care for Child, they took custody, filed a dependency petition, and placed Child with Sibling's Grandmother ("Grandmother"). DCS discussed guardianship with Grandmother, but Grandmother preferred to adopt Child. Grandmother had adopted one of Child's half-siblings and was in the process of adopting another half-sibling.

¶5        In September 2021, DCS filed a motion to terminate the parent-child relationship between Father and Child on abandonment grounds. During this time, DCS made efforts to finalize a permanency plan for Child. Up until that point, Father had not established paternity and had

failed to maintain a normal parent-child relationship even when he was not incarcerated.

**¶6** DCS initiated biweekly video visits between Father and Child as part of a permanency plan. However, Child ended many calls early because he did not want to talk to Father and the calls upset Child. Father believed Child was distracted and disengaged because he would see other children playing outside during the calls. Father's final video visit was in April 2023 because Child told DCS that he no longer wanted to talk to Father. In December 2022, DCS amended the termination motion to allege that the length of Father's sentence also supported the termination.

**¶7** At the termination trial in June 2023, Father testified that he was undecided about his future residence, expressing his desire to move back to Ohio. He also testified he used drugs when he was on parole in 2020 and would need to complete drug treatment and achieve some stability before Child could be placed in his care. Father believed he had a good relationship with Child. However, a DCS case manager testified that Father and Child had no bond or relationship.

**¶8** The juvenile court terminated Father's parental rights on August 14, 2023, finding DCS had proven by clear and convincing evidence that father's length of sentence was grounds for termination, and by a preponderance of the evidence that termination of the Father's parental rights was in the best interests of Child. Father timely appealed. This Court has jurisdiction under A.R.S. §§ 8-235(A), 12-120.21(A)(1), and 12-2101(A)(1).

## DISCUSSION

**¶9** Father challenges the termination of his parental rights to Child pursuant to A.R.S. § 8-533(B)(4) (length of prison sentence of a parent is such that the child will be deprived of a normal home for a period of years). He argues DCS did not do enough to help him maintain his relationship with Child and the juvenile court failed to properly consider whether a guardian was available to care for Child during his incarceration.

**¶10** To terminate parental rights, a court must find clear and convincing evidence of a statutory ground for termination, and that a preponderance of the evidence supports the conclusion that termination serves the child's best interests. *Kent K. v. Bobby M.*, 210 Ariz. 279, 288, ¶ 42 (2005). "[T]he juvenile court is in the best position to weigh evidence and assess witness credibility," so this Court will uphold the juvenile court's

termination order unless clearly erroneous and accept its findings of fact if supported by reasonable evidence and inferences. *Demetrius L. v. Joshlynn F.*, 239 Ariz. 1, 3, ¶ 9 (2016). The juvenile court's findings of fact are viewed in the light most favorable to affirming the court's order. *Michael J. v. Ariz. Dep't of Econ. Sec.*, 196 Ariz. 246, 250, ¶ 20 (2000). Termination orders are reviewed for abuse of discretion. *Jeffrey P. v. Dep't of Child Safety*, 239 Ariz. 212, 213, ¶ 5 (App. 2016).

## I. DCS Provided Father Sufficient Services.

**¶11** Father first contends DCS failed to provide ongoing visitation to assist in maintaining and strengthening his relationship with Child. "Because parents incarcerated for a lengthy period still possess a fundamental liberty interest in the care, custody, and management of their children, *Troxel v. Granville*, 530 U.S. 57, 65[ ] (2000), DCS must make diligent efforts to preserve the family by providing services to assist parents in maintaining a bond with their children." *Jessie D. v. Ariz. Dep't of Child Safety*, 251 Ariz. 574, 581-82, ¶ 20 (2021). "If DCS seeks to terminate parental rights under § 8-533(B)(4)'s provision addressing the parent's length of felony sentence, and an incarcerated parent requests reunification services, such as visitation, and providing the services will not endanger the child, DCS must make reasonable efforts to provide these services." *Id*. at ¶ 21. But DCS need not provide every conceivable service or "undertake rehabilitative measures that are futile." *Mary Ellen C. v. Ariz. Dep't of Econ. Sec.*, 193 Ariz. 185, 192, ¶ 34 (App. 1999).

**¶12** Father argues DCS did not allow him to strengthen his relationship with Child and that there was no reason for them to stop arranging virtual visits. The record belies this claim. To begin, the evidence demonstrates that Father and Child lacked a bond that could be maintained. Even so, when Father intermittently requested visitation with Child, DCS followed up on those requests with calls, even initiating video visitation. DCS agreed to provide Father with additional video visitation after April 2023, but Child refused to participate. DCS's duty was to make efforts to preserve the family and assist in maintaining a bond. Here, DCS fulfilled its duty by making reasonable efforts to provide Father the opportunity to establish a bond with Child.

**¶13** The juvenile court found DCS's actions reasonable and its efforts sufficient, weighing DCS's actions compared to Fathers requests. The juvenile court did not abuse its discretion in finding DCS's "efforts reasonable and sufficient under the circumstances."

## II. The Court Did Not Abuse Its Discretion By Terminating The Parent-Child Relationship.

¶14  Next, Father argues the totality of circumstances weigh in favor of preserving the parent-child relationship. The superior court considers all relevant factors when making its decision, including the following:

> (1) the length and strength of any parent-child relationship existing when incarceration begins, (2) the degree to which the parent-child relationship can be continued and nurtured during the incarceration, (3) the age of the child and the relationship between the child's age and the likelihood that incarceration will deprive the child of a normal home, (4) the length of the sentence, (5) the availability of another parent to provide a normal home life, and (6) the effect of the deprivation of a parental presence on the child at issue.

*Michael J.*, 196 Ariz. at 251-252, ¶ 29.

### A. The Length And Strength Of Any Parent-Child Relationship Existing When Incarceration Begins.

¶15  The juvenile court acknowledged a relationship between Father and Child, however, that relationship was limited and strained. Child would not voluntarily participate in phone call visitations with Father. When contact did occur, Child did not engage, and Child ultimately requested that visitations stop entirely. Based on the evidence presented, the court determined Child did not view Father as a parental figure, and that there was no significant relationship between them.

### B. The Degree To Which The Parent-Child Relationship Can Be Continued And Nurtured During The Incarceration.

¶16  The court found that without Child's willingness to engage with Father, the relationship could not be nurtured. Father attempted to nurture the relationship during his incarceration, yet Child's lack of participation in the visits hindered those efforts. Given Father's limited contact with Child before Father's incarceration, the circumstances here support the juvenile court's conclusions.

C.      The Age Of The Child And The Relationship Between The Child's Age And The Likelihood That Incarceration Will Deprive The Child Of A Normal Home.

¶17      There is no "bright line" rule for when a sentence is of a duration to deprive a child of a normal home for a period of years, so each case must be based on its particular facts. *Michael J.*, 196 Ariz. at 251, ¶ 29. A "normal home" is "a stable and long-term family environment outside a foster care placement, where another parent or a permanent guardian resides and parents the child, and where the incarcerated parent affirmatively acts to maintain a relationship with the child that contributes to rather than detracts from the child's stable, family environment." *Timothy B. v. Dep't of Child Safety,* 252 Ariz. 470, 477, ¶ 27 (2022).

¶18      The court must consider "the total length of time the parent is absent from the family," not just the maximum remaining amount of incarceration that exists at the time of the severance trial. *See Jesus M. v. Ariz. Dep't of Econ. Sec.*, 203 Ariz. 278, 281, ¶ 8 (App. 2002). Matters that could delay reunification after release, such as conditions of release and the time needed for services to be completed after release must also be considered. *See Jeffrey P.*, 239 Ariz. at 214, ¶ 10.

¶19      Here, the court found that Father's incarceration plus the additional time needed to generate a stable living situation and seek treatment will require months—and possibly years—of Father's effort. Based on this finding, the juvenile court reasonably concluded that Father's incarceration and ongoing obligations are of such length that the child will be deprived of a normal home for a period of years.

D.      The Availability Of Another Parent To Provide A Normal Home Life.

¶20      Child has no other parent to provide a normal home life after Mother's parental rights were terminated. Grandmother has provided for Child for a period of years and is willing to adopt Child to provide a normal home life. This factor supports the juvenile court's ruling.

E.      The Effect Of The Deprivation Of A Parental Presence On The Child At Issue.

¶21      Father argues there was no evidence to make a finding that he would detract from Child's stable family environment. But given the length of time Father has been and will be incarcerated, there is necessarily a lack of stability and certainty for Child under such circumstances.

**¶22** Based on the totality of the circumstances and the weighing of these factors, there was sufficient evidence to support the superior court's findings that Father's sentence would deprive Child of a normal home life.

### III. Termination Is In The Child's Best Interest.

**¶23** Lastly, Father argues severance is not in Child's best interests. He argues DCS and the court failed to properly assess the availability and effect of a guardian to assist Child in maintaining a normal home. The court may establish a permanent guardianship if the prospective guardianship is in the child's best interests and all the elements apply. A.R.S. § 8-871(A). The discretion to establish a guardianship lies with the juvenile court.

**¶24** If "the court finds that a parent is unfit, the focus shifts to the interests of the child as distinct from those of the parent," and "[t]he child's interest in stability and security" becomes the court's foremost concern. *Alma S. v. Dep't of Child Safety*, 245 Ariz. 146, 150 ¶ 12 (2018) (internal quotations removed). Termination of a parent's rights "is in the child's best interests if either: (1) the child will benefit from severance; or (2) the child will be harmed if severance is denied." *Id.* at ¶ 13. Among the factors that the court may consider when making this determination "are whether: 1) an adoptive placement is immediately available; 2) the existing placement is meeting the needs of the child[ren]; and 3) the children are adoptable." *Raymond F. v. Ariz. Dep't of Econ. Sec.*, 224 Ariz. 373, 379, ¶ 30 (App. 2010) (internal citations omitted). For the term "adoptable" to have meaning, the Department must prove the potential for adoption is likely, not just possible. *Titus S. v. Dep't of Child Safety*, 244 Ariz. 365, 370, ¶ 22 (App. 2018).

**¶25** Here, the court found Child was placed with Grandmother, who was willing to adopt him. Grandmother was already in the process of adopting Child's other half-siblings. The court found Child "healthy, happy, and loveable" and the current placement "is the least restrictive environment required to meet the needs of the Child."

**¶26** A court may also "consider whether the current placement is meeting the child's needs." *Bennigno R. v. Ariz. Dep't of Econ. Sec.*, 233 Ariz. 345, 350, ¶ 23 (App. 2013) (citing *Maricopa Cnty. Juv. Action No. JS-8490*, 179 Ariz. 102, 107 (1994)). The superior court determined Child would benefit from termination because his adoption would allow him to remain in "a stable, loving environment, and would be able to achieve permanency." *Jessie D.*, 251 Ariz. at 583, ¶ 28. Child has been thriving with his siblings in Grandmother's care and enjoys being around his family. Maintaining these

relationships supports a best interest finding, even more so considering Father's testimony that he is considering moving to Ohio after his release, away from the only environment and stability Child has known. *See generally Audra T. v. Ariz. Dep't of Econ. Sec.*, 194 Ariz. 376, 378, ¶¶ 6-8 (App. 1998).

**¶27**   The juvenile court did not abuse its discretion by finding that terminating Father's parental rights was in Child's best interests, and its ruling was supported by the evidence.

## CONCLUSION

**¶28**   For the foregoing reasons, this Court affirms.



AMY M. WOOD • Clerk of the Court
FILED:   TM